Filed 1/30/15  P. v. Barr CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058083 |
| v. | (Super.Ct.No. SICRF1151887) |
| RONALD EVERT BARR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Inyo County.  Brian Lamb, Judge.  Affirmed with directions.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Peter J. Quon, Jr., and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ronald Evert Barr and George Chezum Jr.[1] lived together in Bishop. One night, 17-year-old Danny H. and 16-year-old Anthony A. came to their house to drink. They all drank several beers together and Danny and Anthony became intoxicated. As the night progressed, Chezum begged them to play strip poker. At first the two boys refused, but eventually agreed to play. Defendant made a bet with Danny that if he won he would get to shave Danny's pubic hair and Chezum bet that he would get to "jack off" Anthony. Defendant and Chezum won. Defendant took Danny into one of the bedrooms and shaved his pubic hair. Danny "blacked out." Anthony knocked on the bedroom door and woke him up. When Danny woke up, his pants were down and defendant was orally copulating him. Danny pushed defendant aside, pulled up his pants and left.

Defendant was convicted in a first trial of misdemeanor annoying and molesting a child. In a second trial, defendant was convicted of oral copulation of an intoxicated person and oral copulation of a person under the age of 18.

Defendant now contends on appeal as follows:

1. He was denied his Sixth Amendment right to effective assistance of counsel due to his counsel's failure to request a pinpoint instruction on the effect of voluntary intoxication on his ability to form the requisite intent for his violations of Penal Code[2]

---

[1]    Chezum is not a subject of the instant appeal.
[2]    All further statutory references are to the Penal Code unless otherwise indicated.

2

section 288a, subdivisions (b)(1) (oral copulation of a person under the age of 18) and (i) (oral copulation of an intoxicated person).

2.      He is entitled to additional presentence custody and conduct credits.

The People concede that defendant is entitled to additional presentence custody and conduct credits and we will order that he receive these credits.  We otherwise affirm the judgment in its entirety.

I

PROCEDURAL BACKGROUND

Defendant was charged by the District Attorney of Inyo County in an amended information with the felony offenses of oral copulation of a minor (§ 288a, subd. (b)(1); count 1) and oral copulation of an intoxicated person (§ 288a, subd. (i); count 2).  He was also charged with the misdemeanor offense of annoying and molesting a child (§ 647.6, subd. (a)(1); count 3), sexual battery (§ 243.4, subd. (e)(1); count 4), and two counts of contributing to the negligence of a minor (§ 272; counts 9 &10).[3]  Defendant and Chezum were tried together in a first trial.

Counts 9 and 10 were dismissed by the trial court pursuant to section 1385 prior to going to the jury.  On May 29, 2012, the jury found defendant guilty of count 3.  The jury could not reach a verdict on counts 1, 2, and 4 and a mistrial was declared as to those counts.

---

[3]      Counts 5, 6, 7, and 8 were charged against Chezum only.  In addition, defendant was charged in the amended information for counts 1 and 2 with having suffered a prior serious and violent felony offense (§§ 667, subds. (a)(1), (b)-(i), 1170.12, subds. (a)-(d).)  The enhancements were dismissed at the first trial.

The second trial only involved defendant. After the second trial, the jury found defendant guilty of counts 1 and 2. It could not reach a verdict on count 4. A mistrial was declared as to count 4 and was dismissed by the People pursuant to section 1385. Defendant was sentenced on February 8, 2013 to the middle term of six years on count 2. The misdemeanor section 647.6 conviction from the first trial was ordered to run concurrent to count 1, and count 2 was stayed pursuant to section 654. Defendant was granted no custody or conduct credits.

II

FACTUAL BACKGROUND[4]

A.    *People's Case-in-Chief*

1.    *Danny's testimony*

Danny was born in July 1993. On August 10, 2010, he was 17 years old. Danny stated in August 2010, he was about five feet, seven inches tall. By the time of trial, he was six feet, one-inch tall and weighed 176 pounds. During August 2010, Danny was staying at a house belonging to Andri A. who lived on Pa-Ha Street in Bishop.

Danny met defendant and Chezum about two weeks prior to August 10 at a location called Buckley Ponds where he was fishing with his friends Anthony and Sara P. Danny talked with defendant about getting together to have a drinking contest.

---

[4]    We note at the outset that both parties in providing their Statement of Facts only relied upon the evidence presented at the second trial as defendant was only convicted in the first trial of count 3 and the only argument that he raises in respect to count 3 is that he is entitled to additional presentence and conduct credits. As such, we also draw the factual background from the evidence presented at the second trial only.

Defendant gave Danny his telephone number and told him to call him anytime he wanted to have the drinking contest.

On August 10, around 4:00 p.m., Danny met Anthony at a smoke shop. They bought cigarettes even though neither of them was 18 years old. They were not asked for identification. They went to Andri's house on Anthony's bicycle. There was a party at the house. Anthony and Danny drank beers that Anthony had. Danny also got someone to buy them a 30 pack of beer. Danny and Anthony did not want to be at the party because the people were getting "drunk" and being "stupid." Danny decided to call defendant. Defendant came and picked them up. Danny brought the remaining beers he had with him. On the way back to defendant's home, they stopped at a gas station at a nearby casino because Anthony wanted to buy more cigarettes. Danny asked defendant to buy the cigarettes for them.

They went to defendant's house located on Diaz Lane in Bishop. They all went inside and Chezum was already inside. Danny "shotgunned" some beers outside which involved drinking the beers very fast (about three seconds for an entire beer). Danny thought that in two hours he drank about 15 beers that he had brought and was "pretty drunk." Danny also thought he drank about four beers that defendant and Chezum had in the house. Danny recalled that defendant was also drinking beers; he thought he drank about five.

Anthony was also drinking and at one point he went outside and vomited. Anthony and Danny both had some wine that defendant gave them. Danny drank a full cup of wine. At this point, Danny was "too drunk." He was staggering. Danny thought the wine was stronger than regular wine.

While they were drinking wine, Chezum kept talking about wanting to play strip poker. Anthony and Danny agreed that they would play until they were down to their boxers. Danny agreed because he was drunk and was tired of Chezum asking them to play. They played teams with Danny and Anthony teamed together. During the game, Danny and Anthony were texting each other that the game was weird and they should leave. Danny insisted that he had since deleted the messages from his phone.

While they were playing, Chezum said, "if we win, we will suck you guys off," which Danny interpreted as they were going to give them "blow jobs." Danny thought that was "fucking disgusting." Defendant also said to Danny that if he won, he would get to shave his pubic hairs. Chezum took off all his clothes during the game and was walking around naked even though he had not lost.

Anthony fell asleep in one of the chairs. Defendant and Danny went outside to have another beer. When they walked back in the house, Danny observed Chezum quickly "pull away" from Anthony. Danny woke up Anthony. Anthony was yelling at Danny that Chezum kept touching him. Anthony encouraged Danny to let defendant shave his pubic area so that Chezum would stop touching him. Defendant kept bothering him to allow him to shave him. Danny was very drunk and did not care anymore. His intoxication clouded his judgment.

6

Defendant and Danny went to the back bedroom. Defendant started shaving his pubic area while Danny lay on the bed. Danny thought he used an electric razor. Danny "blacked" out and the next thing he remembered was Anthony knocking on the bedroom door yelling that they should leave. Danny woke up and saw that Danny was "sucking" his penis. Danny could not recall if he was standing or on the bed. Danny's pants and underwear were around his ankles. He pushed defendant off of him and pulled up his pants.

Danny grabbed his shoes and other clothes he had taken off during the strip poker game from the living room. Danny recalled that he took some beers from the refrigerator. Danny was still drunk and was "disgusted" with what had happened to him.

They walked out to a nearby street where Molly P., Sara's mother, picked them up. Anthony and Danny got into the backseat of Molly's van. Danny told Anthony what had happened to him while he and defendant were in the bedroom. He told Anthony that defendant had put his mouth on his penis. They drove to Molly's house. Molly went to bed and defendant, Anthony and Sara stayed up talking. Danny drank the beers he had taken from defendant and Chezum. Danny did not recall what they talked about that night. Danny went home the following day.

The next day, Danny found out that Anthony had been sent away to a rehabilitation facility. Danny and Anthony did not have a chance to talk after that night. They did not talk until 17 months later when Anthony finally came home. Danny indicated that after the incident, either defendant or Chezum called him. The person on

the telephone asked defendant if he and Anthony were uncomfortable. Danny denied they were uncomfortable. The person stated that they all should all get together again.

2. *Anthony's testimony*

Anthony was born in July 1994 and was 16 years old on August 10, 2010. On August 10, he was five-feet, six inches tall and weighed 145 pounds. Anthony was 18 years old at the time of trial, was five feet, eight inches tall and weighed 165 pounds. In August 2010, Sara was his girlfriend. Robert A. was his father.

Anthony met defendant and Chezum while they were fishing. Defendant and Danny discussed getting together to drink. On August 10, Anthony and Danny were at Andri's house drinking beer. Some other people came to the house. Anthony was afraid of the men that came to the house and told Danny he did not want to be at the house. Danny called defendant. Defendant picked them up. They drove to a nearby casino gas station to buy cigarettes. Defendant bought the cigarettes for them because Anthony would sometimes be asked for identification when buying cigarettes. They then went to the home belonging to defendant and Chezum.

Chezum was in the living room. Anthony recalled that they somehow obtained two 30-packs of beer. Someone suggested they shotgun the beers. Anthony, Danny, and defendant all shotgunned beers while outside. Anthony drank three or four more beers slowly from the can. He was feeling "buzzed." Danny was drinking a lot. Anthony believed that Danny and defendant were engaged in a drinking contest.

8

The beers were upsetting Anthony's stomach so he asked for something else to drink. They gave him some wine. He drank three cups of wine. After the wine, Anthony was feeling drunk. It was then that Chezum suggested that they play strip poker. Anthony and Danny refused to play but Chezum kept bugging them to play.

Anthony wanted to leave because he thought it was getting "weird" but Danny wanted to stay and drink more. Anthony knew that Danny wanted to stay because they were texting each other. Finally, Anthony said, "Whatever, fuck it . . . we'll play." Anthony went back to drinking beer. Anthony finally drank so much that he made himself get sick outside. Defendant was still drinking while they were playing cards.

Danny caught defendant and Chezum cheating at strip poker. Chezum just started randomly taking off clothes. Anthony corroborated that the bet on strip poker was if defendant and Chezum won, Chezum would "jack off" Anthony and defendant would shave Danny. Anthony was shocked. Both Danny and Anthony ended up in their boxer shorts.

Eventually Danny and Anthony were supposed to take off their boxers but at first refused. Chezum took off his boxers. Anthony said "fuck it" and took his off too. Anthony was too drunk to care anymore. His vision was blurry and he did not stand up because he knew he would fall over. At that point, both Danny and Anthony agreed by text that they needed to leave but could not figure out how to leave.

Defendant took Danny to the back bedroom. Chezum moved his chair close to Anthony and started playing with himself. Chezum told Anthony he really wanted to "jack' him off. Anthony told him no. Anthony fell asleep and awoke to find Chezum touching his leg. Chezum then touched his penis and Anthony told him no.

Anthony went back and knocked on the bedroom door. No one answered and Anthony heard an electric razor. Anthony went back to the living room. He was drunk and did not know what to do. Chezum touched his penis again. Anthony put his clothes back on. Anthony told Chezum they had to leave because there was trouble at Andri's house. At that point, Danny came out of the bedroom. Danny put on his clothes. Anthony said they all shook hands and said, "Nothing leaves this house." Defendant and Chezum looked scared.

Anthony called Sara and told her to pick them up. Anthony and Danny waited. Anthony was angry and was crying. Danny told Anthony that he woke up and defendant was licking his dick. Anthony told him that Chezum touched his penis.

Molly and Sara picked them up. Danny and Anthony were talking in the back of the vehicle about what happened. Danny and Anthony were blaming each other for what happened. Danny said in the car that "some gay guy" had licked his penis. Anthony said that "some gay guy touched my dick."

Anthony asked Molly not to say anything to Robert about him drinking because he was afraid he would be sent away to a rehabilitation facility. Danny and Anthony agreed they would not tell anyone what happened. Anthony was sent to a rehabilitation facility.

At that time, Anthony told his father, Robert, that something bad had happened but did not tell him what had happened.

Several weeks later, Anthony sent an email to Robert advising him that he had been molested by a man. Anthony complained about being in the rehabilitation facility and wanted out. At the same time, he wrote an incident report. In that report, he stated that he and Danny were at the home of two gay males. One of them asked them to play strip poker. They agreed to play and Anthony started drinking so he would not feel "weird." They made a bet that one of them could shave Danny. While Danny and one of the men were in the bedroom, Anthony stayed with the other man who started playing with himself in front of him. The man touched Anthony's penis.

Robert still did not come and get Anthony. Anthony was sent to another facility because he tried to escape. Anthony was finally let out on December 9, 2011. Anthony denied that he lied in order to get out of the rehabilitation facilities. Anthony tried to kill himself by hanging in the rehabilitation facility. Anthony also tried to kill himself on August 10 by walking into the road but Sara stopped him.

3.    *Other witnesses*

Sara and Anthony had a tumultuous relationship in August 2010. Anthony had cheated on her and repeatedly lied to her. Sometime after midnight, Sara received a text from Anthony asking for Molly to come get him. Sara asked why. Anthony responded that he would tell her when they picked him up and then asked her to hurry. He also texted that he and Danny "were in hell" and needed help. He told her to pick him up in

11

the area of Diaz and Barlow Streets. Sara woke up Molly and told her that they had to pick up Anthony because he was drunk.

Anthony and Danny ran up to the car when they arrived at the intersection of Diaz and Barlow. When they got in the van, they appeared scared and nervous. They smelled of alcohol. They were slurring their words. Danny told Sara, "'We got touched.'" Anthony then told Danny "We can't tell them." Anthony asked Molly not to say anything. Molly heard them talking about getting touched. Danny then said that he got his penis touched by a guy. Anthony said they got raped. Molly felt that Anthony lied to her a lot.

Sara spoke with Danny and Anthony that night. They discussed that they had played strip poker. Anthony said he got naked and that one of the guys touched his penis. Danny also said his penis was touched. At one point, Anthony ran into the street.

When Molly woke up the following morning, she found two beers in the kitchen. Molly notified Robert that Anthony had been drunk the night before.

### 4. *Investigation*

Stephanie Rennie was an investigator with the Inyo County District Attorney's Office. On September 8, 2010, Robert had advised Rennie that he believed Anthony and Danny had been molested. Later that day, Robert brought Danny to speak with Rennie. Rennie had Inyo County Sheriff's Department Detective Juan Martinez come to the interview with Danny. Danny was very nervous and reluctant to talk. Danny told them that he had been molested by defendant. Danny told them he wanted to speak with

12

Anthony first before talking to them in order to get his story straight. Danny finally told them that defendant had touched his penis.

Rennie discovered that Anthony had made allegations of sexual molestation while in the rehabilitation. She obtained the email sent to Robert and the form Anthony filled out. Rennie and Detective Martinez interviewed Molly, Sara and Anthony. Anthony and Danny had similar but not identical stories. Anthony was hesitant to speak at first. He wanted to get out of the rehabilitation facility. He identified defendant and Chezum.

Rennie and Detective Martinez convinced Danny to make a pretext telephone call to defendant and Chezum. Chezum answered the telephone. Danny told him that Anthony was "freakin out" and told the police what had happened that night. Chezum responded, "Oh. Don't think anything will come of it." Danny then said that the police were trying to contact him. Chezum stated, "Tell 'em nothin'." Chezum then got defendant to talk to Danny. Danny told defendant that Anthony was "running his mouth." Defendant asked who Anthony was and Danny told him. Danny told defendant that Anthony was saying a "whole bunch a crap" and that the police had come to talk to him. Defendant responded, "What were you what, where," and asked what Anthony was saying to the police. Danny said he did not know. Defendant asked Danny what the police had asked him.

Danny told defendant they were asking about one night with Anthony. Defendant responded, "Well tell 'em freakin' back off," "Or tell 'em to go talk to my mom. You're under age, just tell 'em go talk to my mom." Defendant then asked, "You're over 18 right?" Danny answered, "Naw, I'm 17." Defendant stated, "Oh." Defendant told

13

Danny that the police could not talk to him because he was a minor. Defendant asked about Anthony and Danny told him he was in an alcohol rehabilitation facility. Defendant then inquired as to which police department was talking to him. Danny then told him that he had to go. Defendant responded, "Oh yea, umm, uh, keep in touch of what's going on." Danny had not talked to defendant since that phone call.

Rennie and Detective Martinez interviewed Chezum and defendant. Defendant stated he lived on Diaz Lane with Chezum who was his boyfriend.[5] Defendant indicated that he knew from Chezum why the police wanted to talk to him. It was because of the "two minors that came over that were under the age of 18, they came over one night back in September, they came over and they were drunk already." Defendant knew their names were Anthony and Danny. Defendant admitted that he had known Danny since he was a kid. He had met Anthony at Buckley Ponds. When asked how old Danny was, defendant responded, "Uh, 17 or 18? 17, 18? I believe he's gotta be under 18. So, 17 maybe?"

Defendant also stated that Danny and Anthony had beers with them but he did not "partake." Asked again if he had been drinking, defendant responded, "I didn't have nothing to drink. I don't drink." He also denied that he was smoking marijuana. He did not remember if he bought them cigarettes. He denied anything happened between him

---

[5] Defendant has had the videotaped interview sent to this court. However, in his opening brief, he relies upon the transcript of the interview and makes no argument that the transcript is inaccurate. As such, this court only refers to the transcript of the interview.

14

and Danny.  It disgusted him that he was being accused of orally copulating Danny.

Danny and defendant remained outside the entire time.  They did not play strip poker.

Detective Martinez never conducted a DNA test on defendant's razor because it was too long after the incident to be useful.  No phone records were obtained.

Defendant presented no evidence.

## III

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends his convictions of oral copulation of an intoxicated person and of a person under the age of 18 should be reversed because his trial counsel provided ineffective assistance by prejudicially failing to request a jury instruction on voluntary intoxication[6] as a defense to these specific intent crimes.[7]

---

**6** In its standard form, CALCRIM No. 3426 provides in relevant part:  "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted [or failed to do an act] with _____ < *insert specific intent or mental state required*, . . . [¶] A person is *voluntarily intoxicated* if he . . . becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.  [¶] . . . [¶]  In connection with the charge of _____ <*insert first charged offense requiring specific intent or mental state*> the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with _____ <*insert specific intent or mental state required*, . . . If the People have not met this burden, you must find the defendant not guilty of _____ <*insert first charged offense requiring specific intent or mental state*>."  [¶] . . . [¶]  You may not consider evidence of voluntary intoxication for any other purpose. . . ."

**7** There is no discussion of the jury instructions in the record.  There is nothing in the record to support that the voluntary intoxication instruction was requested by defendant's trial counsel.

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

"[E]vidence of voluntary intoxication [is] relevant on the issue of whether the defendant actually formed any required specific intent." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1242-1243; see also § 29.4.) In this case, the jury was instructed as to oral copulation of a person under the age of 18, that a defendant "is not guilty of this crime if [he] reasonably and actually believe[d] that the other person was age 18 or older." As to oral copulation of an intoxicated person, the jury was instructed, in order to find him guilty that "the defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the other person from resisting." There is no dispute that voluntary intoxication was a proper defense to the crimes alleged.

16

"The trial court," however, "has no duty to instruct sua sponte on voluntary intoxication. [Citation.]" (*People v. Clark* (1993) 5 Cal.4th 950, 1022, disapproved on an unrelated point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Rather, "'[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) "'[A] defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."' [Citation.]" (*People v. Verdugo, supra,* 50 Cal.4th at p. 295.) Substantial evidence of intoxication alone is not enough; there must also be evidence that the intoxication impaired the defendant's ability to formulate intent. (*People v. Williams* (1997) 16 Cal.4th 635, 677-678; see also *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661.)

Here, defendant himself denied that he had been drinking that night. While there was some other evidence from Anthony and Danny that defendant had been drinking beers, there was absolutely no evidence that this had any effect on defendant's ability to form any specific intent. If defense counsel had requested a voluntary intoxication instruction, the trial court could properly have refused it. Thus, the failure to request the instruction either as a defense to the oral copulation of a person under the age of 18 or an intoxicated person was not ineffective assistance because there was no substantial evidence to support the instruction.

17

Moreover, defendant has also failed to overcome the strong presumption that, "under the circumstances, [his counsel's] challenged action 'might be considered sound trial strategy.'" (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) "A reviewing court will not second-guess trial counsel's reasonable tactical decisions. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 520.) Here, the record shows the failure to request an instruction on voluntary intoxication as a defense to the specific intent crimes of oral copulation of an intoxicated person or a person under the age of 18 "'might be considered sound trial strategy.'" (*Strickland,* at p. 689.)

In her closing argument, defendant's trial counsel argued that both Danny and Anthony had outright lied about what had happened. Their story was "ridiculous." Anthony began coming up with a plan when he had his first drink that night in order to keep from being sent away to a rehabilitation facility. Defense counsel also advised the jury that "[n]o one could testify as to how many beers possibly [defendant] consumed or not, . . ." Additionally, defense counsel also stated, "[t]here's never been any denial by [defendant] that he knew these gentlemen were under the age of 18. There's no defense here that, Yeah, it happened, but I thought he was 18 years and one day, that's not it." Defense counsel noted that defendant had admitted all along they were minors. Defense counsel argued that although the minors were at defendant's house for a period of time that night, nothing elicit occurred.

It is clear that the defense strategy was to insist that Danny and Anthony had come up with an elaborate lie in order to keep Anthony from being placed in a rehabilitation facility. Defense counsel acknowledged that defendant knew Danny was underage. Also, defense counsel adamantly denied that defendant had been drinking. Based on the state of the evidence, defense counsel could reasonably conclude that the only defense was that no molestation ever occurred. Accordingly, "we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication." (See *People v. Wader* (1993) 5 Cal.4th 610, 643 [rejecting defendant's claim his counsel provided ineffective assistance by failing to request a voluntary intoxication instruction because such a request "would have been inconsistent with defendant's theory of the case"].)

Separately and alternatively, defendant cannot show prejudice. Here, both Anthony and Danny presented compelling and similar testimony about what occurred that night. They both recounted that they were intoxicated to the point that they agreed to play strip poker with two grown men. After losing the game, defendant made Danny pay up on his debt by letting him shave his pubic hair. At that point, Danny "blacked out." Danny awoke to find defendant orally copulating him. Danny and Anthony both talked about being touched in front of Molly and Sara after being picked up very near defendant's house. Moreover, they recounted similar stories after the incident.

The evidence that defendant was voluntary intoxicated was minimal or nonexistent. Moreover, there was no evidence that intoxication had any effect on his ability to form intent. Thus, even if the jury had been instructed on voluntary intoxication, there is no reasonable probability that it would have returned a more favorable verdict based on the strong evidence of defendant's guilt.

IV

CONDUCT AND CUSTODY CREDITS

Defendant contends that he is entitled to presentence actual and conduct credits for the three days he spent in custody when he was initially arrested on all of the charges in this case. Respondent concedes he is entitled to the credits.

A.     *Additional Factual Background*

Defendant was convicted in the first trial of a misdemeanor violation of section 647.6, subdivision (a). The court ordered that sentencing on the charge be continued until the end of the second trial. According to the probation report, defendant was arrested on April 10, 2011, and was released on bail on April 12, 2011.

At the time of sentencing, the trial court stayed the sentence on the misdemeanor section 647.6, subdivision (a) charge. As for credits, the trial court stated, "The defendant has been out of custody. The defendant is entitled to time-served credit in the 647.6 case, but the sentence in that case has been stayed. So for purposes of his felony criminal sentence, he has zero custodial credits."

20

B.      *Analysis*

A defendant is entitled to actual custody credit for "all days of custody" in county jail, including partial days. (§ 2900.5, subd. (a), *People v. Smith* (1989) 211 Cal.App.3d 523, 526.) "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8 ["The failure to award an adequate amount of credits is a jurisdictional error which may be raised at any time."].) "[C]redit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." (§ 2900.5, subd. (b).) Here, we agree with defendant that he was entitled to three days of actual custody credit for the time he spent in custody on all of the charges.

Section 4019 provides that a criminal defendant may earn additional presentence credit against his or her sentence for performing assigned labor and for complying with applicable rules and regulations of the local facility. (*People v. Duff* (2010) 50 Cal.4th 787, 793.) Effective January 25, 2010, the Legislature amended section 4019 to provide that prisoners, with some exceptions, earned one-for-one conduct credits. (Stats. 2009, 3d Ex.Sess. 2009-2010, ch. 28, § 50.) Respondent concedes that defendant was entitled to calculation of his conduct credits under this version of section 4019. We order the trial court to award defendant six days of presentence custody and conduct credits.

V

DISPOSITION

The superior court is directed to correct its award of presentence credits to give defendant a total of six days of presentence custody credits, consisting of three days of actual custody credits and three days of conduct credit.  It is ordered to amend its minute order and abstract of judgment, and to forward copies of the amended documents to the Department of Corrections and Rehabilitation.  In all other respects, the judgment of conviction and the sentence are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

22