Filed 2/26/21  P. v. Stetson CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JASON GILBERT STETSON,<br><br>  Defendant and Appellant. | F078654<br><br>(Super. Ct. No. BF172679A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

## INTRODUCTION

Appellant and defendant Jason Gilbert Stetson was convicted of attempted second degree robbery with one prior strike conviction and sentenced to nine years in prison. On appeal, he contends there is insufficient evidence of force to support his attempted robbery conviction; the court should have granted his motion to instruct the jury with CALCRIM No. 3426 on voluntary intoxication; and pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the court improperly ordered him to pay a restitution fine and other fees without determining his ability to pay such amounts.

We reject defendant's substantial evidence and instructional error claims but, as set forth in part III. of the Discussion, we agree with the People that the court imposed an unauthorized sentence. Therefore, we remand the matter for resentencing, which renders defendant's *Dueñas* claim moot. We otherwise affirm the judgment.

## FACTS

Around 10:20 p.m. on May 18, 2018, Y.L. was working at the front register at a Fastrip gas station and convenience store in Bakersfield. K.M., her coworker, was also standing behind the register, which was located at the door. Y.L's husband, Z.L., was working in the back section of the store. The store had security cameras, and the relevant videos were played for the jury.

The security video showed a car that parked in front of the store. A man later identified as defendant got out of the car and entered the store. Y.L. had never seen defendant before. Defendant walked by her register and did not make eye contact with her, but he looked toward K.M. He went directly to the refrigerator in the back of the store that contained beer.

Defendant took two cases of beer from the refrigerator, held a case in each hand, and walked to the door. Y.L. thought something was going to happen, and she stood by the door and waited for him. As defendant approached the door, he kept walking and did not stop at the register. He did not try or offer to pay for the beer.

Y.L. testified that when defendant did not stop at the register, she tried to take away one case of beer from defendant and called K.M. to help her. K.M. came out from behind the counter, and tried to take the beer and stop defendant from leaving the store. Defendant swung his right forearm at K.M.'s face and neck and started fighting with him. Defendant and K.M. fell on the floor, and K.M. tried to punch defendant.

Y.L. ran to the back of the store to get her husband. He had already heard crashing sounds when his wife yelled that she needed help. Z.L. ran out and found defendant fighting with K.M.; he tried to separate them. Z.L. told defendant to drop whatever he had taken and leave the store. Defendant charged at Z.L. and started fighting with both men. Z.L. testified he was "tossed around" by defendant.

Z.L. told his wife to call 911. During the 911 call, Y.L. told the operator that "they were trying to rob some beer and then everybody started getting into it," and there was a fight in the store.

Y.L. testified that as she talked to the 911 operator, defendant kept fighting with Z.L. and K.M. A Hispanic male entered the store and joined in the fight. He seemed to help defendant and was fighting with Z.L., but he also appeared to pull defendant away. Y.L. did not know who he was or why he got involved.

Y.L. testified defendant seemed "really strong," and he was hitting both Z.L. and K.M. at the same time. Y.L. testified there were usually some people hanging around the outside of the store who appeared to be homeless. As the fight continued in the store, two or three of these men came inside, pulled the Hispanic man out of the fight, and pinned him against the wall.

Y.L. testified the video showed her husband holding defendant in what appeared to be a chokehold, while K.M. looked like he was about to kick defendant. One of the homeless men also appeared to kick defendant. Z.L. testified he never hit defendant, but K.M. accidentally kicked him at one point.

3.

Z.L. testified that he told defendant to leave since he no longer had any merchandise. Defendant walked toward the door, but took a bag of candy from a display and tried to leave. Z.L. told defendant to drop the merchandise, but defendant kept walking and held onto the candy. Z.L. grabbed the item away from defendant as he went through the door. Defendant came back into the store, charged toward Z.L. and grabbed him by the collar.

Y.L. testified someone pulled defendant out of the store. Defendant got in the car that had been parked in front of the store. The security video showed the car immediately left the area. The Bakersfield Police Department arrived about 10 minutes after defendant left the store.[1]

Z.L. testified the store's policy was for employees not to confront shoplifters, and to ask them to drop the merchandise and leave. They gave defendant the chance to do so, but his demeanor was "[n]egative," and he never stopped fighting. Z.L. testified defendant never said anything, and "he was given the options to leave peacefully many times, but I can't dictate why the choice was made on his behalf." Y.L. also testified defendant never stopped fighting, never said anything when he was fighting, and he never apologized during the entire time he was in the store. Y.L. said he was "hitting everybody … with violence," and she was scared.

## PROCEDURAL BACKGROUND

On August 30, 2018, an information was filed that charged defendant with count 1, attempted robbery of K.M. and Fastrip (Pen. Code, §§ 664, 212.5, subd. (c)),[2] and count 2, robbery of Z.L.'s cell phone (§ 212.5, subd. (c)). It was further alleged

---

[1]    The prosecution did not call any officers to testify and did not introduce evidence about how or when defendant was arrested in this case.

[2]    All further statutory citations are to the Penal Code unless otherwise indicated.

defendant had one prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and one prior serious felony conviction (§ 667, subd. (a)).

On November 18, 2018, defendant's jury trial began. Prior to the case going to the jury, the court granted the People's motion to dismiss count 2.

**Closing arguments**

The prosecutor argued defendant was guilty of attempted robbery because he used force against K.M. when he tried to leave the store with the stolen beer.

Defense counsel conceded the video showed that defendant took the beer and tried to walk out without paying, but he appeared "highly intoxicated" and "stumbling," there was no evidence that he planned to commit a robbery, and he did not use force or violence. Instead, counsel asserted K.M. initiated the use of force or violence, was "overly aggressive," and used excessive force because he pulled a box cutter; it became "an all-out drunken brawl" when the homeless men joined in; and defendant was trying to defend himself from getting "pummeled."

In rebuttal, the prosecutor agreed that the offense started as an attempted petty theft when defendant entered the store, took the beer without force, and headed to the door. However, the offense became an attempted robbery when defendant punched K.M. and used force as he tried to leave the store and deprive the clerk of the store's property. The prosecutor argued the video showed Z.L. and K.M. were not overly aggressive because they just tried to take the beer away from defendant, but defendant fought with them as he tried to hold onto the beer.

**Verdict and sentence**

On November 26, 2018, defendant was convicted of attempted second degree robbery. The court found the prior conviction allegations true.

On January 3, 2019, the court denied defendant's request to dismiss his prior strike conviction and the prior serious felony enhancement. It imposed the second strike

5.

"upper" term of four years, plus five years for the prior serious felony enhancement, for an aggregate term of nine years.[3]

The court imposed a restitution fine of $300 (§ 1202.4, subd. (b)), suspended the parole revocation fine of $300 (§ 1202.45), and ordered victim restitution in an amount to be determined.

The court revoked probation in an unrelated case where defendant was convicted of second degree robbery in 2017, and imposed a concurrent term of three years with credit for time served. The court noted that fines and fees had already been imposed in the 2017 case, ordered him to pay those unpaid balances plus the previously suspended probation revocation fine of $300 (§ 1202.44), and suspended the parole revocation fine of $300 (§1202.45).

Based on the two convictions, the court imposed a total of $80 in court operations assessment fees (§ 1465.8) and $60 in criminal conviction assessment fees (Gov. Code, § 70373).

### DISCUSSION

### I.      Substantial Evidence of Attempted Robbery

Defendant claims there is insufficient evidence of force to support his conviction for attempted robbery. He contends that the store clerk initiated the use of force against him, he only used force to defend himself, and his offense was actually an attempted petty theft.

### A.      *Substantial Evidence*

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense[]" (*Carella v. California* (1989) 491 U.S. 263, 265,

---

[3]      As we will explain in part III. of the Discussion, the court apparently relied on the sentencing triad for first degree robbery, and the matter must be remanded for resentencing.

6.

citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357).  On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Zamudio*, *supra*, at p. 357.)

### B.  *Attempted Robbery*

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211; accord, *People v. Gomez* (2008) 43 Cal.4th 249, 254.)  "'An attempt to commit a crime consists of two elements:  a specific intent to commit the crime and a direct but ineffectual act done toward its commission.'"  (*People v. Moses* (2020) 10 Cal.5th 893, 899.)  "An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission." (*People v. Medina* (2007) 41 Cal.4th 685, 694.)

Robbery is a species of aggravated larceny.  (*People v. Gomez, supra*, 43 Cal.4th at p. 254.)  It is a continuing offense that begins from the time of the original taking and lasts until the robber reaches a place of relative safety.  (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)  Robbery "includes two phases:  acquiring the property, and carrying it away (in the parlance of legalese: caption and asportation).  [Citations.]  What sets robbery apart from simple theft is the use of force or fear and taking from the victim's immediate presence.  'Theft by larceny may be committed without force or the threat of violence and may be completed without the victim ever being present.'  [Citation.]  In the prototypical case, a person commits robbery by assaulting a person and then stealing the

7.

person's property. The force or fear is used to acquire the property." (*People v. Robins* (2020) 44 Cal.App.5th 413, 418–419.)

For purposes of robbery, "a taking is not over at the moment of caption; it continues through asportation," and "a robbery can be accomplished even if the property was peacefully or duplicitously acquired, if force or fear was used to carry it away." (*People v. Gomez, supra*, 43 Cal.4th at p. 256.) Thus, "[i]n order to support a robbery conviction, the taking, either the gaining possession *or* the carrying away, must be accomplished by force or fear." (*Id.* at p. 257, italics omitted.)

## C. *Analysis*

Defendant argues his conduct amounted to an attempted petty theft because he did not use force or fear when he attempted to take the beer, and the store clerks had already taken the beer from his hands when K.M. initiated the force, threw the first punch, and assaulted him without cause. Defendant argues that since the beer was no longer in his possession, he did not attempt to use force or fear to take the merchandise or regain possession of it.

There is substantial evidence to support defendant's conviction for attempted robbery. The type of robbery at issue here is an *Estes* robbery, which occurs "when [the] defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which [the] defendant originally acquired the property." (*People v. Estes* (1983) 147 Cal.App.3d 23, 27–28 (*Estes*).) "What sets an *Estes* robbery apart from a standard robbery is that the force or fear is used not in the acquisition of the property, but in the escape." (*People v. Robins, supra*, 44 Cal.App.5th at p. 419.) "The typical case starts with a shoplifting and turns into a robbery when the thief is confronted by a [loss prevention officer], and the thief assaults the [loss prevention officer] in an attempt to get away." (*Ibid.*) The defendant's use of force to prevent a store employee from retaking the property, and to facilitate his escape, is sufficient to establish the force required to

support a robbery conviction. (*People v. Gomez, supra,* 43 Cal.4th at pp. 258–259.) There may be a "successful attempt" of an *Estes* robbery. (*People v. Robins*, *supra*, at p. 420.)

In this case, defendant entered the store, walked directly to the beer display in the rear, took two cases of beer without using force, turned around, and walked to the front door without pausing to pay for the beer at the cashier's desk. Our review of the video shows that defendant held a case of beer in each hand as he walked toward the door. Y.L. and K.M. approached defendant from either side and tried to take the beer cases from his hands. Defendant turned sideways so his back was to Y.L., held onto the beer, and kept walking to the door. K.M. reached for defendant's right hand that was holding onto the beer. Defendant continued to walk as K.M. appeared to hold onto the beer case. Defendant raised his right arm, swung his forearm into K.M.'s face and neck, and dropped the beer cases from both hands. Defendant's blow briefly pushed K.M. away from him. Defendant fell and threw both arms at K.M., who threw a punch at defendant, and a fight ensued.

Defendant initiated the use of force as he tried to leave the store with the two cases of beer. Thus, there is substantial evidence that he used force to prevent the store's employee from regaining control of the stolen property, supporting his conviction for attempted robbery.

## II. The Court's Denial of the Voluntary Intoxication Instruction

Defendant next argues the court committed prejudicial error when it denied his request to give a voluntary intoxication instruction as relevant to mitigate the specific intent required for attempted robbery. Defendant asserts the instruction was supported by substantial evidence based on the testimony of Y.L., who testified that he appeared intoxicated.

**A.** *Y.L.'s Testimony*

Defendant's instructional request was based on Y.L.'s trial testimony and the security videos. During cross-examination, defense counsel played the store's security videos and asked Y.L. to narrate the incident. Y.L. testified when defendant entered the store, he was "kind of" running.

> "[DEFENSE COUNSEL]. It's kind of a goofy looking run; is that fair to say?
>
> "A.   Yes."
>
> "[DEFENSE COUNSEL]. … [D]id [defendant] appear unsteady that night?
>
> "A.   Yes, he did. [¶] … [¶]
>
> "Q.    … Is it fair to say [defendant] kind of zigzagged down that aisle?
>
> "A.   Yes."

Defense counsel asked Y.L. to look at defendant's shoes as shown in the video. Y.L. testified the laces on defendant's left shoe were untied.

Y.L. testified she had seen people at the store and in her personal life who were intoxicated.

> "[DEFENSE COUNSEL]. Did [defendant] appear intoxicated that night?
>
> "A.  Yes, he did.
>
> "Q.  He didn't appear very intoxicated?
>
> "A.  I can't really say really, but I know he was intoxicated. The way he looked, yes.
>
> "Q.  Was he belligerent that night?
>
> "A.  A little bit."

Y.L. testified defendant used the same kind of "goofy jog" when he left the store and got into the car.

On redirect examination, Y.L. testified she had never seen defendant before that night and did not know how he usually walked or ran, or if his behavior was any different than his normal gait. The prosecutor asked Y.L. why she thought defendant was drunk. Y.L. testified defendant was not sober. He was able to walk into the store, but he did not walk "correct" like a sober person would do. "Well, the way he was standing and his eyes were like this. He was not okay." She agreed that defendant walked directly to the refrigerator, took the beer, and tried to walk out.

### B. *Defendant's Instructional Request*

After the parties rested, the court reviewed the requested instructions and noted defense counsel asked for the following version of CALCRIM No. 3426 on voluntary intoxication.

> "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted or failed to do an act with the specific intent required for the charged crime of attempted robbery, or the lesser included offense of attempted petty theft.

> "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

> "In connection with the charge of attempted robbery, and/or the lesser offense of attempted petty theft, the People have the burden of proving beyond a reasonable doubt that the defendant acted or failed to act with the required specific intent. If the People have not met this burden, you must find the defendant not guilty of the charged offense and/or the lesser included offense.

> "You may not consider evidence of voluntary intoxication for any other purpose."

11.

Defense counsel argued the instruction was relevant for the jury to decide whether defendant was intoxicated and lacked the specific intent to commit attempted robbery or the lesser included offense of attempted petty theft.

The prosecutor objected to the instruction and argued that while Y.L. testified as a lay witness to her opinion that defendant was belligerent, the only possible evidence of intoxication was her description that he used a "goofy jog" and his shoelace was untied. As such, there was insufficient evidence to support the instruction because "[n]o one spoke with the defendant. There's no evidence that he smelled of being under the influence. No direct evidence that he stated he was under the influence .…"

Defense counsel replied that Y.L. described how defendant zigzagged down the aisle and why she believed he was intoxicated. Counsel argued there was an inference that defendant was intoxicated on alcohol since he went straight to the beer case when he entered the store.

### C.    *The Court's Initial Ruling*

The court initially advised the parties that it was likely to deny the request for the voluntary intoxication instruction.

> "With regards to the evidence of voluntary intoxication, really the evidence on that subject that's of potential weight boils down to [Y.L.'s] opinion, lay witness opinion that [defendant] appeared to be intoxicated. There is no evidence as to what the potential substance was that he was intoxicated on. There was no testimony indicating that he had or anyone smelled the odor of an alcoholic beverage on his breath or about his person. Those arguably—the walking around with his shoelace untied could be indicative of—to some extent, the person might be intoxicated, but I would venture to guess there are far more people walking around with their shoelaces untied who are not intoxicated on alcohol or on any other substance .…
>
> "I would also—by his walk is perhaps a little bit stronger in terms of supporting a corroborative evidence, but, again, the problem is there is no evidence as to what, if anything, he was intoxicated on or any—and there is no direct evidence that he was intoxicated.

"Now, there doesn't need to be direct evidence on this, as on any other issue of the circumstantial evidence is sufficient to support the giving of the instruction, and it's sufficient and that's the way that it is, but in this case, there's just [Y.L.'s] opinion and it's not an unsupported opinion. She did indicate that she has had experience dealing with customers who were intoxicated, but she also indicated that she had had no previous experience with or knowledge of [defendant] himself and so it's not that strong a read on which to support the voluntary intoxication instruction since we have no idea of the substance we are talking about or really what the level of his intoxication, if any, is."

The court further found it would be complete speculation for the jury to find defendant was intoxicated "because there is no evidence, at all, as to what, if any, intoxicating substance he used or ingested or the circumstances under which he ingested it."

The court stated it would review the matter further, but it was inclined to find "the essentially unsupported opinion of one lay witness that a person they are not familiar with appears to be intoxicated is not a sufficient basis for giving the instruction."

### D. *The Court's Denial of the Instruction*

When the court next convened, it denied defendant's request for the voluntary intoxication instruction. The court accepted the credibility of Y.L.'s testimony, but found there was no evidence "as to the defendant's level of intoxication, which I think is the most significant of these issues, its voluntary nature for the substance on which he was intoxicated." Y.L.'s testimony did not rise to the level to show that defendant was so intoxicated that a reasonable juror should draw the conclusion that he was unable to form the required specific intent. "All [Y.L.] testified to was that he appeared to be intoxicated, looked unsteady, and, quote, 'zigzagged,' end quote, down the aisle—that was her word—appeared intoxicated and was belligerent."

The court acknowledged Y.L.'s testimony about defendant's untied shoelace, but found that fact was not significant. The court found the evidence was not substantial enough for the jury to conclude defendant could not form the specific intent as a result of

13.

some level of voluntary intoxication "since all we know at the scene he appeared to the clerk to be intoxicated and was somewhat unsteady going down the aisle."

In the alternative, defense counsel asked the court to give the involuntary intoxication instruction and argued it was relevant since the court was concerned about the lack of evidence of how defendant became intoxicated.

The court denied counsel's request for the involuntary intoxication instruction because there was insufficient evidence that he was intoxicated to the point where he lacked the specific intent to commit the crime.

> "[T]here simply is no meaningful evidence as to the level of intoxication that [defendant] was under. As testified to on redirect by [Y.L.] that she had not met [defendant] previously, wasn't familiar with him, so she lacks contact with him directly, but even with that, her opinion certainly is admissible and worthy of consideration that he was intoxicated, but that's pretty much literally all she said. She described a couple physical symptoms which would, at least arguably, fairly reasonably in one case, perhaps less so in the other, but which arguably in both cases—and I'm referring to the untied shoe and the unsteady gait going down the aisle— those would, at least arguably, support the conclusion that he was intoxicated, but they don't support any particular level of intoxication and particularly not a level of intoxication that is sufficient to persuade a reasonable juror that based on that, he lacked the specific intents necessary for the crime or the lesser included offense."

### E.     *Voluntary Intoxication*

"The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon." (*People v. Miller* (1962) 57 Cal.2d 821, 830–831.)  "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent …." (§ 29.4, subd. (b).)  "[E]vidence of voluntary intoxication is relevant to the extent it bears upon the question whether the defendant *actually* had the requisite specific mental state required for commission of the crimes at issue." (*People v. Horton* (1995) 11 Cal.4th 1068, 1119.)

14.

A trial court is required to give a requested jury instruction only if it is supported by substantial evidence, i.e., evidence sufficient to deserve jury consideration. (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "In deciding whether [the] defendant was entitled to the instructions urged, we take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief. [Citations.]' [Citation.] '"Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' [Citations.]' [Citation.] Even so, the test is not whether *any* evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded"' that the specific facts supporting the instruction existed." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.)

"A defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.'" (*People v. Williams* (1997) 16 Cal.4th 635, 677; accord, *People v. Verdugo* (2010) 50 Cal.4th 263, 295.) In other words, even upon a request, "an intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence *also* shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state." (*People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661.) We review the trial court's refusal to give a requested instruction de novo. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

**F.**   *Analysis*

None of the three witnesses in this case testified they smelled alcohol on defendant's breath or person. However, Y.L., as a lay witness, testified to her belief that defendant was intoxicated based on her prior experience with other customers and people who were intoxicated.

15.

Assuming, without deciding, that Y.L.'s testimony constituted some evidence that defendant was intoxicated, there is an absence of any evidence that established, or from which it could be reasonably inferred, that he lacked the specific mental state required for attempted robbery due to his alleged intoxication, or linking his alleged intoxication to a frame of mind that precluded him from forming the requisite specific intent. (*People v. Williams*, *supra*, 16 Cal.4th at pp. 677–678.) Defendant entered the store with one purpose: he went directly to the beer display, took two cases, and headed for the door without attempting to pay for the merchandise. When Y.L. and K.M. moved to stop him, he tried to hold onto both beer cases, threw a punch at K.M., and then kept fighting with both K.M. and Z.L.

The incident was not over, however, and defendant engaged in additional conduct that showed his specific intent to commit a robbery. The fight subsided, and Z.L. told defendant to leave since he did not have any merchandise. Defendant headed toward the door, but grabbed a bag of candy from a display and tried to leave. Z.L. told defendant to drop the candy. He failed to do so and again headed out the door. Z.L. grabbed the candy away from defendant, who came back into the store, charged toward Z.L., and grabbed him by the collar, resulting in another fight.

Defendant's behavior thus showed that even if there was evidence of intoxication, his alleged intoxication did not have any effect on his ability to form the requisite specific intent to steal based on his attempt to walk directly out of the store with the beer cases, and then to again try to take another item of merchandise after the fight. (See, e.g., *People v. Williams*, *supra*, 16 Cal.5th at pp. 677–678.)

Finally, even if the court should have given the voluntary intoxication instruction, the error was not prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836, for the same reasons. Defendant was determined to take the two beer cases, used force to try and get out of the store, and, when he lost control of the merchandise, tried to steal one more item and again fought with the store clerk to escape with the stolen merchandise. It is not

16.

reasonably probable that defendant would have obtained a more favorable result if the court had given the voluntary intoxication instruction. (*People v. Vasquez* (2015) 239 Cal.App.4th 1512, 1520; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134–1135.)

## III.    Sentencing Error

The People have advised this court that the matter must be remanded because of a sentencing error based on the following circumstances. (*People v. Smith* (2001) 24 Cal.4th 849, 852, quoting *People v. Welch* (1993) 5 Cal.4th 228, 235 [An unauthorized sentence is "reviewable 'regardless of whether an objection or argument was raised in the trial and/or reviewing court.'"].)

The sentencing triad for first degree robbery is three, four, or six years in prison. (§ 213, subd. (a)(1)(B).) The triad for second degree robbery is two, three, or five years in prison. (*Id.*, subd. (a)(2).) The punishment for an attempt to commit any crime that is punishable by imprisonment in state prison is "one-half the term of imprisonment prescribed upon a conviction of the offense attempted." (§§ 664, subd. (a), 213, subd. (b).) If the defendant has one prior strike conviction, the punishment imposed "shall be twice the term otherwise provided as punishment for the current felony conviction." (§ 667, subd. (e)(1).)

Defendant was convicted of attempted second degree robbery, and the court found he had one prior strike conviction and one prior serious felony enhancement. At the sentencing hearing, the court denied defendant's request to dismiss both the prior strike conviction and the prior serious felony enhancement. The court found the "middle term" was appropriate, but then imposed the second strike "upper term of four years," plus a consecutive term of five years for the prior serious felony enhancement, for an aggregate term of nine years.

As noted by the People, a four-year term is not authorized for attempted second degree robbery, and the court appeared to erroneously rely on the triad for first degree robbery. Therefore, the sentence imposed is unauthorized and this matter must be

17.

remanded for resentencing. (*People v. Scott* (1994) 9 Cal.4th 331, 354–355; *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205.)

## **DISPOSITION**

The matter is remanded for resentencing. Following resentencing, the trial court shall issue an amended abstract of judgment and forward a certified copy to the appropriate authorities. The judgment is otherwise affirmed.


MEEHAN, J.

I CONCUR:


DeSANTOS, J.

POOCHIGIAN, Acting P.J., Concurring and Dissenting.

I concur with the majority opinion's decision to remand the matter for resentencing. However, I respectfully dissent from the majority opinion's conclusion that remand renders defendant's contentions under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 moot. While the matter is being remanded for the court to correct the attempted robbery sentence, the court imposed the statutory minimum amounts of mandated restitution fine and fees, and will be obliged to impose those same amounts again.

At the sentencing hearing, the court imposed the statutory minimum restitution fine of $300 (§ 1202.4, subd. (b)), suspended the parole revocation fine of $300 (§ 1202.45), and ordered victim restitution in an amount to be determined. It also imposed the statutorily required amounts of $80 in court operations assessment fees (§ 1465.8) and $60 in criminal conviction assessment fees (Gov. Code, § 70373).

On appeal, defendant argues the court improperly imposed the restitution fine, fees, and assessments without determining his ability to pay pursuant to *Dueñas.* As explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), I believe *Dueñas* was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. Under that standard, the fines and fees imposed in this case are not grossly disproportionate to defendant's level of culpability and the harm he inflicted, and thus not excessive under the Eighth Amendment. (*Id.* at pp. 1068–1072.)[1]

To the extent it is argued *Dueñas* applies to this case, the court imposed the minimum restitution fine of $300, and defendant lacked the statutory authority to object

---

[1] The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

to that order under the governing law at the time of his sentencing hearing. (Cf. *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154.)

Even if I agreed with *Dueñas*, I would reject defendant's constitutional claims and find any error arising from the court's failure to make an ability to pay finding was harmless beyond a reasonable doubt, since defendant has the ability to pay the fines and fees imposed in this case. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Aviles, supra*, 39 Cal.App.5th at pp. 1075–1077; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031.)

" ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody. [Citation.]' [Citations.]" (*Aviles, supra*, 39 Cal.App.5th at p. 1076.)

It can be inferred from the record that defendant has the ability to pay the aggregate amount of fines and fees from probable future wages, including prison wages. (*Aviles, supra*, 39 Cal.App.5th at p. 1076; *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.) I believe *People v. Potts* (2019) 6 Cal.5th 1012 (*Potts*) is persuasive on this particular point. The trial court in *Potts* ordered a defendant convicted of capital murder to pay the statutory maximum restitution fine of $10,000, partially based on the probation officer's erroneous statement that a condemned inmate would be assigned a job in prison. At the time of the hearing, the applicable restitution statute permitted the court to consider the defendant's inability to pay, but the defendant did not object. (*Id.* at pp. 1055.) The defendant filed a postjudgment motion for the court to reduce the fine because of the court's mistake and his inability to pay and argued his own source of income in prison was limited to small financial gifts from family and friends. The court denied the motion and found that

2

seizing even a small part of the defendant's income was a minimal burden considering the incredible loss he inflicted to the victim's family. (*Id.* at pp. 1055–1056.)

*Potts* held the trial court abused its discretion when it imposed the fee based on the erroneous belief that a defendant sentenced to death would be permitted to work. However, *Potts* held the error was harmless beyond a reasonable doubt based on the court's findings when it denied the postjudgment motion to modify the fine. (*Potts, supra*, 6 Cal.5th at pp. 1055, 1056.) *Potts* explained that the defendant's alleged inability to pay because he lacked a prison job would be "blunted by the fact that he would retain at least some of the money sent to him" by family and friends. (*Id.* at p. 1056.) The trial court was "permitted to conclude that the monetary burden the restitution fine imposed on defendant was outweighed by other considerations," such as the seriousness and gravity of the offense, and the circumstances of its commission. (*Id.* at pp. 1056–1057.)

There is nothing in the record to show that defendant in this case would be unable to satisfy the fines and fees imposed by the court while serving his term, even if he fails to obtain a prison job. While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his prison sentence. (See, e.g., *Potts, supra*, 6 Cal.5th at pp. 1055–1057; *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

I would remand for resentencing as explained in the majority opinion and otherwise affirm.


POOCHIGIAN, Acting P.J.