[No. E008604. Fourth Dist., Div. Two. Jan. 29, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY DEAN IVANS, Defendant and Appellant.

**COUNSEL**

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DABNEY, J.**—Defendant Jerry Dean Ivans was charged in an amended information in count 1 with attempted first degree murder of Joy Chavez (Pen. Code[1], §§ 664/187), in count 2 with attempted first degree murder of Donald Cain (§§ 664/187), and in count 3 with unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a)). The information alleged as to counts 1 and 2 that Ivans used a firearm (§ 12022.5) and inflicted great bodily injury on the victims (§ 12022.7). The information alleged as to all counts that Ivans had previously been convicted of assault with a deadly weapon, a serious felony. (§ 667, subd. (a).)

Ivans admitted the prior felony. The jury found Ivans guilty as charged and found true the firearm use and great bodily injury allegations.

At the sentencing hearing, Ivans moved for a new trial and requested substitution of counsel. The court denied Ivans's motion for new trial and

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

request for substitution of counsel. The court sentenced Ivans to the upper term of three years for the unlawful taking and a consecutive one-year term for the prior felony.[2] The court imposed life sentences for counts 1 and 2, consecutive to each other and to the determinate prison term. As to count 1, the court added a consecutive two-year term for the use of a firearm, a consecutive three-year term for inflicting great bodily injury, and imposed and stayed a one-year term for the prior felony. As to count 2, the court imposed a three-year enhancement for great bodily injury and imposed and stayed enhancements for firearm use and for the prior felony.

On appeal, Ivans contends the trial court erred in (1) failing to instruct the jury with CALJIC No. 4.21; (2) failing to instruct the jury to consider joyriding as a lesser included offense; (3) refusing to conduct a *Marsden*[3] hearing when Ivans requested substitution of counsel; (4) improperly ordering the revocation of Ivans's driver's license; and (5) imposing an excessive restitution fine.

The People concede the trial court imposed an excessive restitution fine. We conclude that the trial court erred in (1) failing to instruct the jury on the lesser included offense of joyriding and (2) failing to inquire into Ivans's reasons for requesting substitution of counsel. We also conclude the finding of use of a motor vehicle in the commission of the offense must be stricken.

FACTS

Ivans had lived with Chavez for about three months in 1987. When their relationship ended, Ivans physically abused Chavez. Ivans's parole was revoked as a result of the incident. Chavez refused to testify in Ivans's behalf that she had started the fight.

In the early morning of August 4, 1989, Chavez and Cain were packing a pickup truck which had a camper shell, in preparation for a trip. Cain had received the pickup truck from his neighbor, Tim O'Leary. In settlement of a drug transaction gone awry, Cain had exchanged a travel trailer for the less expensive pickup truck. However, Cain had hooked the trailer up to the pickup and had left town for a week. He then returned and had patched things up with O'Leary. When Chavez and Cain were packing the pickup, Ivans approached. Ivans said he was there because he had heard the pickup

---

[2] On examining the case file of the earlier conviction, the trial court determined that the offense was not a serious felony under section 1192.7. By stipulation of counsel at sentencing, the court therefore imposed an enhancement under section 667.5, subdivision (b). Ivans does not appeal from this disposition.

[3] From *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

had been stolen from O'Leary. Cain explained that he had worked things out with O'Leary a few days before. Ivans suggested they go to O'Leary's house to talk it over, but Cain refused.

Ivans and Chavez began to argue about her failure to testify on his behalf at the parole revocation proceedings, and they called each other names. Cain said he had heard enough and started to get out of the pickup.

When Cain was climbing over the tailgate, he saw a bright light and heard a shot as Ivans's right hand came up holding a handgun. Cain heard four more shots. Cain did not have a weapon that morning.

Cain was shot just above his left eye. The bullet broke his jaw and lodged in his neck below his left ear. The bullet could not safely be removed, because of its position near the spinal cord. Cain's left eye had to be removed.

Chavez was shot four times. One bullet passed through her left arm and remains lodged near her heart. Two bullets entered the front of her chest. A fourth bullet entered her buttocks and exited near her genitals. Chavez had surgery twice following the shooting, and still experiences pain.

Cain and Chavez both had used methamphetamine (speed) in the past and had observed others who were under the influence of speed. Neither had taken any drugs that morning. Ivans did not appear to them to be under the influence of speed, although Cain assumed Ivans was on speed because he was a known user who was up at 4 a.m. Cain testified that after three or four days of using speed without sleeping, a person gets jittery, jumpy and paranoid.

A month or so after the shooting, the manager of an equipment rental center in Fontana reported that someone had broken into his business premises and had taken a black Mitsubishi pickup. The next day, September 7, 1989, California Highway Patrol (CHP) Officer Karlene Hicks noticed a Mitsubishi pickup stopped on the right shoulder of the freeway near Ludlow. She stopped to check on the welfare of the occupants. Ivans sat in the driver's seat, and he had a female passenger. Ivans seemed annoyed by the officer's contact. He stated he had lost his driver's license. When asked to produce registration and proof of insurance, he said he had borrowed the car from a friend.

He gave a false name, and the officer ran a check on that name and on the pickup. The officer learned the pickup was stolen and arrested Ivans. At the

CHP station, Ivans waived his *Miranda*[4] rights. He told Hicks the pickup was stolen, but then changed his story, saying he had no idea if it was stolen or not. He also gave conflicting versions about who had stolen it.

He was questioned by other CHP officers. He eventually revealed his true name, and the officers learned through a computer check that he had an outstanding arrest warrant for attempted murder. Ivans initiated an "off-the-record" conversation in which he told the officers in a boastful manner about shooting Cain and Chavez. Ivans said he had been paid $900 to retrieve a pickup for a friend, but that a man in the back of the pickup had pulled a shotgun on him. Ivans pulled his own gun and "beat him to the draw and shot him once in the head." Ivans stated he then saw his ex-girlfriend in the back of the pickup. She started screaming, and Ivans shot her three times "in order to do it right" because she was a witness. He stated he had gotten even with Chavez for causing his parole revocation.

*The Defense*

Ivans lived with Chavez from fall of 1987 until January 1988. After his release from prison, he tried to find her to retrieve his personal belongings which she held. A month or so before the shooting, she told him she had put their possessions in storage, and they had been forfeited for failure to pay storage charges.

About the same time, Ivans met Cain when Ivans was coasting through an alley with his lights off to save a weak battery. Cain asked him what he was doing. About 10 minutes later, Ivans encountered Cain at O'Leary's garage. Cain was carrying a pump shotgun.

In the early morning of August 4, Ivans met John Masterson, another friend of O'Leary's, at an all-night grocery store. Masterson gave Ivans the key to a pickup and told Ivans he could make a few dollars by bringing the pickup to O'Leary. Masterson believed that Cain was in wrongful possession of the pickup. Ivans did not seem to Masterson to be under the influence of speed.

Ivans testified he had then been high on speed for a month and had not slept for several days. He decided to repossess the truck, but was worried about Cain's shotgun, so he borrowed a pistol from a friend. He was startled to see Cain and Chavez in the back of the pickup. A conversation ensued, which developed into an argument with Chavez. When Cain started climbing out of the pickup, Ivans thought he had something in his hand. Fearing it was Cain's shotgun, Ivans pulled out his pistol and emptied it into the shadows of

---

[4]From *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, A.L.R.3d 974].

the camper shell. Cain had told Masterson that he had climbed out of the pickup, intending to stick Ivans with a knife.

Ivans hid out in motel rooms. Around September 1, he caught a ride to Arizona in a Mitsubishi pickup with some acquaintances. He did not at first know the Mitsubishi was stolen, but had learned that before his arrest. He lied about his name to the CHP officer to protect his companion from grand theft charges.

He testified that he had told the CHP interrogators his story after he had been handcuffed to a table for three or four hours. He was scared and nervous, not boastful, when he was relating his story to the officers. He never told the officers he had gotten revenge on Chavez by shooting her. He denied he had told the officers other details about which the officers had testified.

DISCUSSION

*Failure to Instruct the Jury With CALJIC No. 4.21*

██ Ivans contends the trial court erred in failing to instruct the jury sua sponte with CALJIC No. 4.21[5]. That instruction informs the jury of the effect voluntary intoxication can have upon a person's ability to form the requisite criminal intent. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1179 [270 Cal.Rptr. 286, 791 P.2d 965].) ██ The court must instruct the jury sua sponte under CALJIC No. 4.21 "when the evidence warrants and the defense is not inconsistent with the defendant's theory of the case [citation] . . ." (*Ramirez, supra,* at p. 1179.) However, an intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence *also* shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state. (*People v. Williams* (1988) 45 Cal.3d 1268, 1311-1312 [248 Cal.Rptr. 834, 756 P.2d 221].)

In *Ramirez*, the defendant testified he had drunk eight to ten beers the night of his crime, and " 'was higher' " than he was when arrested a few days later with a blood-alcohol level of .14 percent. (*Ramirez, supra,* 50 Cal.3d at

---

[5]CALJIC No. 4.21 (1989 rev. 5th ed. pocket pt.) states, "In the crime of _____ of which the defendant is accused [in Count[s] _____ of the information], a necessary element is the existence in the mind of the defendant of the [specific intent to] _____ [mental state[s] of _____].

"If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether defendant had such [specific intent] [mental state].

"If from all the evidence you have a reasonable doubt whether the defendant formed such [specific intent] [mental state[s]], you must find that [he] [she] did not have such [specific intent] [mental state[s]]."

p. 1180.) However, neither the defendant nor any other witness testified that the drinking had noticeably affected the defendant's mental state or actions. The defendant gave a detailed account of the events that night, and never suggested that his memory or conduct had been impaired. (*Id.*, at p. 1181.) The court found that no evidence suggested the defendant's drinking "had affected his mental state in a manner that might negate the specific intent or mental state required," and the trial court did not err in failing to instruct the jury sua sponte with CALJIC No. 4.21. (*Ramirez, supra,* at p. 1181.)

In other cases, courts found insufficient evidence to support a sua sponte intoxication instruction when (1) the defendant had drunk some beer and whiskey and was " 'pretty well plastered' " (*People* v. *Spencer* (1963) 60 Cal.2d 64, 88 [31 Cal.Rptr. 782, 383 P.2d 134]); (2) the defendant had been drinking for several hours, but was "only woozy and not completely 'blacked out' " (*People* v. *Simpson* (1987) 192 Cal.App.3d 1360, 1370 [237 Cal.Rptr. 910]); (3) the defendant had been drinking before the crime; he appeared to be " 'a little high' " at the time of the crime, and he testified he was " 'pretty drunk' " (*People* v. *Cram* (1970) 12 Cal.App.3d 37, 42 [90 Cal.Rptr. 393]); and (4) the defendant had drunk a dozen beers and some wine and thought he was drunk, but knew what he was doing. (*People* v. *Gonzales* (1970) 4 Cal.App.3d 593, 607 [84 Cal.Rptr. 863]).

 In this case, Masterson, who saw Ivans a few hours before the shootings, and the two victims testified that Ivans seemed calm and did not exhibit any symptoms of a person high on speed. Cain testified that Ivans was a regular user of speed, and Cain assumed Ivans was high on speed that morning, although Cain did not observe any specific symptoms. Cain described, in the abstract, the effects continuous speed use can have, including jumpiness and paranoia. Chavez had seen Ivans before when he was under the influence of speed. Then, he had talked faster and was more active in his movements. In contrast, on the morning of the shooting, he appeared fairly calm. Ivans testified that at the time of the shooting he had been high on speed for a month and had been awake for three or four days. However, Ivans gave detailed testimony about the events that morning, including meeting Masterson, obtaining a weapon from a friend, going to the truck, and getting into an argument with Chavez. This evidence was insufficient to show that Ivans's drug use had affected his mental state, and therefore no sua sponte instruction on voluntary intoxication was required. (*Ramirez, supra,* 50 Cal.3d at p. 1181.)

*Lesser Included Offense of Joyriding*

 Ivans next contends the trial court erred in failing to instruct the jury on the lesser included offense of joyriding (§ 499b)[6]. The information charged that Ivans violated Vehicle Code section 10851, subd. (a) because he "did willfully and unlawfully drive and take a certain vehicle . . . without the consent of and with intent, either permanently or temporarily, to deprive the . . . owner of title to and possession of said vehicle."

When an information charges a defendant with both driving *and* taking a vehicle without the owner's consent, it necessarily charges a violation of both section 499b and Vehicle Code section 10851. (*People* v. *Barrick* (1982) 33 Cal.3d 115, 133 [187 Cal.Rptr. 716, 654 P.2d 1243].) The *Barrick* court explained how the two offenses differ: "[S]ection 10851 requires a driving or taking with the specific intent to deprive the owner permanently or temporarily of title or possession of the automobile [citation]. Penal Code section 499b, the joyriding statute, does not require a specific intent to deprive the owner of title or possession of a vehicle [citations]. However, the section does require a 'purpose' or 'intent' of 'temporarily using or operating the same.' [Citation.]" (*Barrick, supra*, 33 Cal.3d at p. 134, fns. omitted.)

A later decision has clarified the intent element of the offense of joyriding. (*People* v. *Diaz* (1989) 212 Cal.App.3d 745 [260 Cal.Rptr. 806].) "The ordinary meaning of the phrase 'for the purpose of' is to delineate some additional consequence or purpose. Thus, the individual must not only intend to take the vehicle, but must also intend to temporarily use or operate the same." (*Id.*, at pp. 750-751.)

The People argue that a person is guilty of joyriding but not of an unlawful taking if he reasonably believes his use will not deprive the owner of possession, citing *People* v. *Bailey* (1946) 72 Cal.App.2d Supp. 880, 883 [165 P.2d 558] and *People* v. *Neal* (1940) 40 Cal.App.2d 115, 116-118 [104 P.2d 555].

The *Neal* court discussed the differences between section 499b and former Vehicle Code section 503, the predecessor of Vehicle Code section 10851. The *Neal* court stated that "specific intent is not an element in the violation of [section 499b]." (*Neal, supra*, 40 Cal.App.2d at p. 118.) This position was abrogated in *Barrick, supra*, 33 Cal.3d at page 134.

The *Bailey* court stated that joyriding is a taking of a vehicle with the purpose not to deprive the owner of use or possession, but to temporarily use or operate the vehicle. According to *Bailey*, joyriding is committed, among

---

[6]"Any person who shall, without the permission of the owner thereof, take any automobile, . . . for the purpose of temporarily using or operating the same, shall be deemed guilty of a misdemeanor, . . ." (§ 499b.)

other things, when an owner surrenders possession of his vehicle to another, and the defendant takes the vehicle from the bailee. (*Bailey, supra,* 72 Cal.App.2d Supp. at p. 883.) Other courts have not followed this narrow definition of joyriding. (See *Barrick, supra,* 33 Cal.3d at pp. 132-135; *People v. Tiebout* (1983) 141 Cal.App.3d 1011, 1013-1014 [190 Cal.Rptr. 754].)

The People assert that if the jury believed that Ivans took the vehicle, it could not reasonably have believed he did not intend to deprive the owner of possession. However, in *Neal,* the court held that evidence that the defendant stripped the car was properly admitted to show the intent to deprive the owner of possession; the taking and abandoning of the car *did not necessarily* furnish sufficient evidence of that intent. (*Neal, supra,* 40 Cal.App.2d at pp. 117-118.)

The People also argue that as a matter of law, a person who knows he is driving a stolen vehicle cannot fail to intend to deprive the owner of possession. His act of driving it ratifies the deprivation of possession, and he thus becomes an aider and abettor of the deprivation of the owner's possession. This position is contrary to *Neal,* which the People rely on for another purpose. (*Neal, supra,* 40 Cal.App.2d at pp. 117-118.) This position is also inconsistent with the California Supreme Court's discussion in *Barrick* concerning whether the evidence in that case supported an instruction on joyriding. (*Barrick, supra,* 33 Cal.3d at p. 135.)

The *Barrick* court evaluated whether the evidence in that case supported an instruction on joyriding: "The Attorney General argues that because the evidence in this case showed that the ignition switch in the victim's car had been substantially altered, a more serious offense than joyriding was shown. In our view, the evidence relating to the tampered ignition does not reflect on whether the defendant had the specific intent to deprive the owner of the possession of her car or a mere intent to use and operate the vehicle, but merely shows the method by which the automobile was taken." (*Barrick, supra,* 33 Cal.3d at p. 135.) The court thus concluded that it was error to fail to give the joyriding instruction. (*Ibid.*)[7]

 Here, as in most cases, evidence of intent was only circumstantial. Ivans was found in the driver's seat of the parked vehicle the day after it was

---

[7] "The Legislature has enacted three statues dealing with the taking of an automobile without the owner's consent: 'grand theft-auto' (Pen. Code, § 487, subd. 3); 'driving or taking a vehicle' (Veh. Code, § 10851); and 'joyriding' (Pen. Code, § 499b). As we observed in *People v. Thomas, supra,* 58 Cal.2d 121, 125-126: 'the physical conduct prohibited by the three enactments is substantially the same, but . . . there purports to be a distinction as to the intent with which the act is done in each instance. It may be presumed that the Legislature intended by these sections to deal with problems which are properly distinguishable . . . . The distinction . . . is admittedly a subtle one, and would present a rather difficult problem if it were required that a court instruct a jury as to the distinction in a given situation.' " (*Barrick, supra,* 33 Cal.3d at p. 134.) Our only suggestion to the harried trial judge who is

taken, and some distance away. The evidence could have supported a finding that Ivans had the "intent or purpose of temporarily using or operating" the Mitsubishi. (§ 499b; *Tiebout, supra,* 141 Cal.App.3d at pp. 1013-1014.) We conclude the trial court erred in failing to instruct the jury on the lesser included offense of joyriding.

■ When the trial court fails to instruct on lesser included offenses, reversal is required unless the factual issue raised by the omitted instructions was necessarily decided adversely to the defendant under other properly given instructions. (*People v. Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on another ground in *People v. Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) ■ No other instructions covered the issue; thus the error requires reversal of Ivans's conviction under Vehicle Code section 10851.

*Marsden Hearing*

■ Before sentencing, Ivans asked the court to appoint new defense counsel. He based his request on trial counsel's purported incompetence and failure to bring a motion for new trial.[8] When a defendant requests new counsel, the court must allow the defendant to relate specific instances of counsel's conduct to support the claim of counsel's incompetence or lack of diligence. (*Marsden, supra,* 2 Cal.3d at p. 124.)

---

presented with this problem is to fashion a jury instruction from those portions of the *Barrick* decision which distinguish the code sections.

As *Barrick* points out, the manner in which the auto theft is charged may determine whether instructions on the joyriding statute (§ 499b) are required to be given as a lesser included offense of Vehicle Code section 10851. (*Barrick, supra,* 33 Cal.3d at p. 133.)

In addition to the three statutes described in *People v. Thomas* (1962) 58 Cal.2d 121, 125 [23 Cal.Rptr. 161, 373 P.2d 971], the Legislature in 1989 added section 499b.1. This gives the prosecutor greater latitude in charging an auto theft. However, it exacerbates the problem facing a trial judge in preparing appropriate jury instructions in a given case.

It is our suggestion that the Legislature should revisit the auto theft statutes and consider repeal, amendment or enactment of corrective legislation of these confusing statutes. Conceivably, one auto theft statute would suffice to cover the crime in California.

[8]The record contains the following colloquy.

"THE DEFENDANT: For the record, your Honor, for good cause and justification, I wish to have new counsel appointed. My counsel is not competent. He won't file my motion for new trial. It was brought to my attention that evidence was removed from the jury room. It's my understanding that the most time I was to receive is fourteen years. *Those are some of the grounds.*

"[Defense counsel]: My client is upset.

"THE COURT: Mr. Ivans, number one, [defense counsel] represented you in my opinion in a very effective manner. Number two—your motion will be denied on that ground.

"Number two, the fact of the matter is Exhibit No. 1, for the record, is a diagram of the crime scene. And it is true, in fact, that Exhibit No. 1 . . . was taken by a juror after the end of the trial.

"[The prosecutor]: After the verdict.

"THE COURT: After the verdict. Apparently it was left hanging up in the jury room and he took it home with him. It was brought to our attention the following morning that the exhibit

Here, the trial court addressed those reasons Ivans articulated for his dissatisfaction with his counsel. However, Ivans stated that he had listed only *some* of the reasons for his request for new counsel. Under *Marsden*, the court was required to inquire into those unstated reasons. " 'A trial judge is unable to intelligently deal with a defendant's request for . . . substitution of attorneys unless he is cognizant of the grounds which prompted the request.' [Citation.] A denial of appellant's motion for new trial based on ineffective representation without careful inquiry into the defendant's reasons for claiming incompetence ' "is lacking in all the attributes of a judicial determination." [Citations.]' [Citation.]" (*People* v. *Stewart* (1985) 171 Cal.App.3d 388, 398 [217 Cal.Rptr. 306].)

The People assert that the trial court "made inquiry and listened to appellant's complaints." The record reveals otherwise; the court did not inquire into all of the reasons for Ivans's request, even though Ivans explicitly stated he had listed only some of his reasons. This was error under *Marsden*.

In *People* v. *Lewis* (1978) 20 Cal.3d 496, 499 [143 Cal.Rptr. 138, 573 P.2d 40], the court discussed whether failure to hold a complete inquiry is prejudicial: " 'There can be no doubt it was. On this record we cannot ascertain that defendant had a meritorious claim, but that is not the test. Because the defendant might have catalogued acts and events beyond the observations of the trial judge to establish the incompetence of his counsel, the trial judge's denial of the motion without giving defendant an opportunity to do so denied him a fair trial. We cannot conclude beyond a reasonable

---

was missing. That exhibit is a diagram of the scene which was adequately and totally talked about by witnesses, described on the record, photographs were admitted.

"In any event, that exhibit was searched for, extensive search was done, and a day later the juror brought the exhibit back to the court. It was located, brought back, and it appeared to be in an untampered condition.

"In fact, he was going to throw it away, I guess, and retrieved it, and it's there. It's not something that is an item of physical evidence, like drugs, or anything else that could be altered in any way. It's a diagram, appears to be unmarked except for the markings in the court, and frankly no major motion on that ground was proposed. And I deny it on that ground. There's no denial of due process or anything else. It temporarily was taken by a juror and brought back to the court after the verdict.

"[The prosecutor]: As to the allegation about the fourteen years, I think our record should reflect that fourteen years was offered to Mr. Ivans as a plea bargain and he was soundly advised regarding that offer and he rejected it.

"THE COURT: That's correct. I'm sure the record will reflect that, because it was talked about before the trial. And I thought in my opinion that was a fairly generous offer in the case. We had discussions about it. That was our pretrial offer. He rejected it and he went to trial. That's what happens at times. You weigh the risk of going to trial.

"[The prosecutor]: And he had conferred with his attorney and I think another attorney regarding that offer.

"THE COURT: I don't find any grounds for your motion. You've got a record here for the court of appeal. So if those are your grounds for new trial, each and every one of those motions are denied for the reasons just stated." (Italics added.)

doubt that this denial of the effective assistance of counsel did not contribute to the defendant's conviction.' [Citation.]"

When, as here, a request for new counsel comes after trial, and the court fails to conduct a proper *Marsden* hearing, "[t]he appropriate course of action is to remand to the trial court to allow it to fully inquire into appellant's allegations concerning counsel's performance. Following the inquiry, if the trial court determines that defendant has presented a colorable claim of ineffective assistance, then the court must appoint new counsel to fully investigate and present the motion for new trial. If, on the other hand, the inquiry does not disclose a colorable claim, the motion for new trial may be denied and the judgment reinstated. [Citation.]" (*People* v. *Winbush* (1988) 205 Cal.App.3d 987, 992 [252 Cal.Rptr. 722].) We conclude such a procedure is appropriate in this case.

### Driver's License

Ivans complains of the suspension of his driving privilege under Vehicle Code section 13350. The court's finding of use of a motor vehicle related to Ivans's conviction of a violation of Vehicle Code section 10851. Because we reverse his conviction on that count, the issue of the suspension of his driver's license is moot. That finding must be stricken.

### Restitution Fine

The trial court imposed a total restitution fine of $23,000 ($10,000 each on counts 1 and 2 and $3,000 on count 3.) ■ Under Government Code section 13967, the maximum fine that may be imposed in a criminal prosecution is $10,000 "regardless of the number of victims or counts involved." (*People* v. *Sutton* (1989) 212 Cal.App.3d 1254, 1259 [261 Cal.Rptr. 194].) Thus, the restitution fine must be limited to $10,000.

### DISPOSITION

Ivans's conviction of a violation of Vehicle Code section 10851 is reversed; the finding of motor vehicle use is ordered stricken; and the restitution fine is ordered stricken. In addition, the remainder of the judgment is reversed and the matter is remanded for the limited purpose of holding a hearing on Ivans's *Marsden* motion. If Ivans makes a prima facie showing of ineffective assistance of counsel, the court is directed to appoint new counsel for the purpose of bringing a motion for new trial. If Ivans fails to make a

prima facie showing of ineffective assistance of counsel, the court is directed to reinstate the judgment of conviction as to the attempted murder counts and related special allegations, and the court should impose a new restitution fine not to exceed $10,000.

Ramirez, P. J., and Hollenhorst, J., concurred.