Filed 10/7/21  P. v. Dixon CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B306637 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA473202 |
| v. | |
| SHIMRON SHERWIN DIXON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Shimron Sherwin Dixon of the first degree murder of Luis Gonzalez. The jury found gun and gang allegations true. On appeal, Dixon contends the trial court violated his constitutional rights by (1) excluding an officer's testimony about Dixon's possible intoxication an hour or so before the murder, and (2) imposing a restitution fine and court fees without determining his ability to pay them. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

1. ***The shooting***

As Dixon doesn't challenge the evidence against him, we summarize it only briefly. On the morning of November 5, 2018, Luis Gonzalez was working at a body shop and tire store he owned on Slauson Avenue. Gonzalez's wife Victoria Rodriguez worked with him there. The business had a storage building for parts and supplies. That morning, Gonzalez and Rodriguez had received a shipment of oil and were unloading it from a car.

Rodriguez heard her husband call out. She looked toward the business and saw a person later identified as Dixon in front of one wall. Dixon began approaching Gonzalez. Gonzalez asked Dixon what he was doing. Gonzalez and Dixon "exchanged words" in angry tones for two or three minutes.

Dixon began walking toward a daycare center next door. Gonzalez followed him and they started arguing again. Gonzalez turned back toward his business. Dixon lifted his sweater and pulled out a gun. Rodriguez screamed at her husband to "run or do something because he's going to shoot you." Dixon shot Gonzalez three to five times. Gonzalez "collaps[ed] little by little" and Rodriguez ran toward the business to call her brother-in-law.

Filberto Becera had lived on the same block as Gonzalez's shop for 16 or 17 years. Around 10:30 on the morning of November 5, 2018 he heard six or seven shots. Becera went

2

outside to look for his son.  He saw Dixon walking slowly on the sidewalk.  Dixon said, "Loco dude shooting down there.  Guy's shooting down there in the corner."  Dixon crossed the street, walking slowly and looking back.  Becera later picked Dixon's picture out of a photo lineup.

Officers who responded to the scene saw spray painted graffiti on a wall of Gonzalez's business.  The graffiti was "RMS."  Jurors were shown surveillance video from nearby businesses of Dixon spray painting the wall.  The video contained audio of Dixon asking Gonzalez, "You got a problem?" and then saying, "R-M-S Locos.  That's my barrio."

RMS is a gang.  The letters stand for "Reload My Strap," "Real Mad Skills," "Reefer, Money, Sex," or "Repping My Set."  Jurors were shown an Instagram photo of Dixon making a gang sign with his hands.

A deputy medical examiner testified Gonzalez had been shot seven times, including a shot to the chest that struck various organs, caused significant bleeding, and was fatal.

In November 2018 Barbara Bennett was dating Dixon.  Dixon was living with Bennett and her brother at a house rented by their mother, Patricia Wyrick.  Sometime between 10:00 and 11:00 a.m. on the morning of November 5, Dixon woke Bennett up "in a panic," "[l]ike freaking out."  Dixon had "an accident slip in his hand."  Dixon had taken Bennett's car—a gray 2013 Chevy Impala—and wrecked it.

Bennett walked to the scene of the collision where she found her parked car.  It was totaled.  A tow truck towed the car back to Bennett's house.  Dixon rode with the tow truck driver and Bennett walked.  Wyrick demanded Dixon pay the tow truck driver.  Dixon told the driver he had to go get the money.  Dixon and the driver left.  They were gone about 30 minutes.

Wyrick and Bennett walked to a mini-mart where Dixon used to work. When they returned to Bennett's house, Dixon was asleep on the porch. Wyrick said "it took a while to wake him up." Bennett and Wyrick told Dixon he had to leave. They threw Dixon's belongings out of the house. About 15 minutes later, Bennett and Wyrick saw that Dixon and his belongings were gone.

Dixon texted Bennett every day. At first the texts said he was remorseful and sorry. But after Bennett told Dixon she "didn't want any contact with him anymore," the texts became threats: "I want to kill you. Just threats. Threats after threats. I know where you live. . . . I know where your mother lives." Dixon told Bennett he knew what time her brother went to school and where the school was. He threatened to "go up to his school and shoot him." Dixon called Bennett about 100 times.

## 2. *The charges, verdicts, and sentence*

The People charged Dixon with Gonzalez's murder. The People alleged that Dixon had personally and intentionally used and discharged a firearm causing Gonzalez's death and that he had committed the crime for the benefit of a criminal street gang. The People also charged Dixon with criminal threats against Bennett.

Dixon chose not to testify.

The jury convicted Dixon of first degree murder and found the firearm and gang allegations true. The jury acquitted Dixon on the criminal threats charge. The court sentenced Dixon to 50 years to life. The court ordered Dixon to pay a restitution fine of $500 under Penal Code section 1202.4, subdivision (b),[1] a $40 court security fee under section 1465.8, and a $30 criminal

---

[1] References to statutes are to the Penal Code.

4

conviction assessment under Government Code section 70373. The court imposed and stayed a parole revocation restitution fine of $500 under section 1202.45.  Neither Dixon nor his counsel objected to the restitution fine or fees, or asserted any inability to pay them.

## DISCUSSION

1. ***The trial court did not abuse its discretion when it excluded an officer's testimony about Dixon's demeanor an hour or so before the shooting***

   a. *Trial testimony about possible intoxication*

   At trial, defense counsel asked Bennett if Dixon "appear[ed] high" when he woke her up that morning.  Bennett answered, "Yes."  Wyrick also testified that, when she asked Dixon where the car was, he "stuttered . . . like he was high."  When the prosecutor asked Wyrick how she knew Dixon was high, she responded, "I know people that use drugs.  I know when someone's high."  Neither attorney asked Bennett or Wyrick any more questions on the subject, such as whether Dixon used drugs, what kind of drugs he used, or when they'd last seen him use.

   Officer Andy Procel testified that, around 9:45 a.m. on the morning of November 5, 2018, he was at a car wash when he heard a traffic collision.  One of the motorists involved in the collision was Dixon.  Procel "approached both vehicles to render aid."  Dixon "had a big bulge in his waistband area"; it turned out to be a spray paint can.

   While Procel "[got Dixon's] information"—"normal information for a car accident"—his partner called for traffic officers.  Dixon then moved the car "to a safer location" on a nearby corner.  The prosecutor asked Procel if he'd searched Dixon's car and Procel said he hadn't.  He explained, "There was no reason to at that point.  It was just a traffic accident."

5

The prosecutor asked, "[D]id anything else about the defendant's demeanor . . . cause[ ] you to do a more serious investigation; such as a D.U.I. or drug under the influence [*sic*] investigation?" Procel answered, "No."

On cross-examination, defense counsel asked Procel if "there was a discussion about the person in the car [Dixon] being high." The prosecutor objected. At sidebar, defense counsel said, "I wasn't planning on getting into any of this until" the prosecutor elicited testimony about a possible DUI investigation. Apparently referring to a dashcam or body-worn recording device, counsel said, "I've heard this video, they talk about him being high and uninsured. There's some discussion of it."

The court said, "Here is the problem[.] . . . [A]ssume for the moment you're correct. Why is it relevant? Whether he was high or not, it's an hour before the actual events in this case and . . . there's the danger of the jury misusing any information about him being high or not being high. You're not presenting [a voluntary] intoxication [defense]."[2]

Counsel did not contradict the court or say he was planning to present a voluntary intoxication defense. Instead, he said, "Because of the way he answered the question about his investigation it becomes an issue about his credibility." The court agreed, telling the prosecutor his questioning had been "misleading." The court said it was inclined to exclude the line of questioning but would permit counsel to question Procel outside the jury's presence.

---

[2] The reporter's transcript reads, "You're not presenting involuntary intoxication offense." It is plain from the context, however, that what the court meant was "a voluntary intoxication defense."

With the jury on break, defense counsel asked Procel, "Do you remember a conversation about the person in the vehicle . . . appearing high and uninsured and that's why he's freaking out?" Procel answered, "I just remember him wanting to go back to the vehicle." Counsel played the recording for the witness, then asked, "[D]oes that help refresh your recollection about whether he was 'smoking some shit' or something to that tune [*sic*]?" Procel responded, "As far as him being high, no. I do remember he kept wanting to go back to his vehicle." Counsel asked, "Was that you who said he was 'smoking some shit'?" Procel answered, "Yes, sir." Counsel asked, "That didn't concern you as to his level of sobriety?" Procel responded, "I just remember he was acting strange. He appeared to be more nervous than high or anything."

Defense counsel asked no further questions of Procel during the hearing outside the jury's presence. The court concluded it was "not going to go down that road" based on lack of relevance as well as consumption of time.

b.     *The jury instruction conference*

On the morning of the last day of testimony, the court discussed jury instructions with counsel. The court had given counsel a set of proposed instructions the day before. Defense counsel asked the court to instruct on voluntary intoxication. Counsel said, "I realize . . . the jury did not hear significant evidence of voluntary intoxication. Out of an abundance of caution, I'd ask the court to give that instruction." The court referred to CALJIC Nos. 4.21.1 and 4.22; counsel confirmed those were the instructions he was requesting.

The court stated, "The simple response is there is insufficient evidence to support it. I have a number of cases, basically, [that say] it's not sufficient just to say that someone's intoxicated." The court continued, "You really don't have

7

much evidence, in that, you have to tie the possible intoxication to the defendant's actual[ ] formation of, or failure to form the requisite state [of mind] for the charge of the first degree premeditated murder. That's really specific."

The court discussed cases it had read: *People v. Ivans* (1992) 2 Cal.App.4th 1654, *People v. Williams* (1988) 45 Cal.3d 1268, and *People v. Rodriguez* (1986) 42 Cal.3d 730. The court said,

> "[Y]ou didn't go into it in any great detail. We had several of the people, Patricia and Ms. Bennett[;] they both said that he was high. [¶] They didn't give any idea as to . . . how high he was or [how] intoxicated. There was no evidence that he actually took any drugs or had any drinking [*sic*]. [¶] We had no testimony from the defendant himself explaining . . . how the intoxication may have [a]ffected him, if he was, in fact, intoxicated. [¶] Even more significantly there was no expert called that might have provided [testimony] to fill in the gap."

The court observed that "an intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless evidence also shows he became intoxicated to the point he failed to form the requisite intent or obtain the requisite mental state." The court then told defense counsel, "You have your record. I assume you're objecting to not giving it—is that right—you're requesting it and I'm denying it?" Counsel responded, "Thank you."

c.     *The trial court did not err*

Dixon concedes that, "The court correctly denied, based on the evidence that had been presented, an instruction on

8

voluntary intoxication." He also concedes the evidence that Bennett and Wyrick found Dixon "passed out" or sleeping "does not, obviously, establish that appellant was intoxicated at the time of the shooting."[3]

Instead, Dixon contends, "The error by the court was that the court cut off inquiry into appellant's level of intoxication before the shooting, through examination of Officer Procel." Dixon asserts, "Officer Procel clearly thought appellant was intoxicated to at least some degree." The record belies these assertions.

The record on appeal does not include the "video" defense counsel said he had listened to when the court discussed the issue with counsel at sidebar. It is unclear if the reference to Dixon "being high and uninsured" was a conversation between the officers, and if the reference to "smoking some shit" also was an officers' conversation or a question Procel asked Dixon.

---

[3] The reporter's transcript repeatedly misspells "passed" as "past." Bennett first testified she found Dixon "sleeping" on her porch. Later, defense counsel asked her, "When you got home is that when you described Mr. Dixon's [passed] out in front of the house?" Bennett answered, "Yes." Defense counsel asked, "By '[passed] out' do you mean he is asleep?" Bennett again answered, "Yes."

Wyrick testified that when she and Bennett returned from the mini-mart Dixon "was on the porch sleep [*sic*]." She continued, "We tried to wake him up. And it took a while to wake him up." Bennett testified this was around noon, but Wyrick testified it was probably about 3:00 p.m. Neither witness ever testified Dixon appeared to be unconscious or "passed out" from drugs or alcohol. The record does not support Dixon's assertion on appeal that, "There was evidence presented that, within an hour or an hour and a half after the shooting, appellant was so intoxicated that he passed out."

In any event, the court sent the jurors away so defense counsel could question Procel further on the issue outside their presence. Even after the video was played in an effort to refresh Procel's recollection, he seemed to deny that he had believed Dixon was "high": "As far as him being high, no[;] I do remember he kept wanting to go back to his vehicle." When asked about the "smoking some shit" remark, Procel responded, "I just remember he was acting strange. He appeared to be more nervous than high or anything." Procel did not arrest Dixon for driving under the influence, and he permitted Dixon to go move his car to a safer corner. Surely Procel would not have allowed Dixon to get back into his car and drive it if he thought he was impaired.

As for his repeated assertions that the trial court "cut off questioning" during the hearing, Dixon is mistaken. After defense counsel asked Procel if he'd been concerned about Dixon's "level of sobriety" and Procel gave the "acting strange" answer, counsel didn't ask any more questions. The court then essentially said its tentative would be the ruling: "I'm not going to go down that road." Counsel never said he had more questions on the subject or complained that the court had not allowed him to finish his inquiry.

In sum, the court did not abuse its discretion in concluding Procel's testimony—that Dixon seemed more nervous than high, and wanted to get back to his car—was not relevant to Procel's credibility[4] and would "open[ ] the door to time-consuming evidence that [the court didn't] think [was] that probative."

---

[4] As the Attorney General notes, defense counsel told the court the "high and uninsured" line of questioning was relevant to Procel's credibility; he did not argue it went to Dixon's ability to form the intent to shoot Gonzalez or any voluntary intoxication defense.

## 2. *The trial court did not err in imposing a restitution fine and court fees*

Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Dixon contends the trial court violated his due process rights by imposing a $500 restitution fine and court fees without making a determination that he had the ability to pay them. Dixon was sentenced 18 months after *Dueñas* was decided yet he didn't cite that case or challenge the imposition of the fine and fees. Indeed, after listing the fine and fees, the trial court asked defense counsel, "Mr. Sadr, anything you want to say or that you want to discuss?" Counsel answered, "No, Your Honor."

Moreover, even before *Dueñas* was issued, section 1202.4, subdivision (d) provided that inability to pay could be considered if the restitution fine imposed exceeded the statutory minimum. (§ 1202.4, subd. (d).) Because the $500 fine imposed was above the minimum of $300, Dixon had a statutory right to an ability-to-pay determination at sentencing. Yet neither he nor his counsel objected, asserted he was indigent, or requested an ability-to-pay determination.

As a general matter, the failure to raise an argument in the lower court forfeits the argument the ruling was erroneous. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 856 [constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it].) By failing to raise this issue below, Dixon forfeited the argument that the court erred by not considering his ability to pay. (See *People v. Miracle* (2018) 6 Cal.5th 318, 355-356 [by not objecting to restitution fines above the statutory minimum at sentencing hearing, defendant forfeited any challenge]; *People v. Gamache* (2010) 48 Cal.4th 347, 409 [same]; *People v. Avila* (2009) 46 Cal.4th 680, 728-729 [same].)

11

Finally, the trial court's imposition of the fine and fees is not an "unauthorized sentence," as Dixon contends. (See *People v. Jinkins* (2020) 58 Cal.App.5th 707, 713.) Nor has Dixon demonstrated that his counsel was constitutionally ineffective in not objecting to the fine and fees. The record does not establish Dixon was indigent and unable to pay, nor has he shown a reasonable possibility of prejudice. Claims of ineffective assistance usually must be raised in a petition for a writ of habeas corpus, where relevant facts and circumstances not reflected in the record on appeal can be brought to light to inform the inquiry. (*People v. Snow* (2003) 30 Cal.4th 43, 111.) "[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) This is not that rare appellate record.

## DISPOSITION

We affirm Shimron Sherwin Dixon's judgment of conviction.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

LAVIN, Acting P. J.

HILL, J.*

---

* Judge of the Santa Barbara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.