Filed 11/19/24  P. v. Nardini CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY THOMAS NARDINI,<br><br>    Defendant and Appellant. | 2d Crim. No. B333259<br>(Super. Ct. No. 2023006779)<br>(Ventura County) |

Anthony Thomas Nardini appeals from the judgment after a jury convicted him of attempted willful, deliberate, premeditated murder (Pen. Code,[1] §§ 187, subd. (a), 664, subd. (a); count 1), aggravated mayhem (§ 205; count 2), and assault with a deadly weapon (§ 245, subd. (a)(1); count 3).  The jury found true allegations as to counts 1 and 2 that Nardini personally used a deadly weapon (§ 12022, subd. (b)(1)), and as to all counts, that he personally inflicted great bodily injury

---

[1] Subsequent statutory references are to the Penal Code.

(§ 12022.7, subd. (a)).  The court sentenced Nardini to life in prison with the possibility of parole plus a determinate prison term of four years.

Nardini contends the trial court: (1) precluded the jury from considering evidence of intoxication regarding deliberation and premeditation based on instructional error; (2) failed to exercise its discretion to select the count on which to impose sentence (§ 654); and (3) erroneously imposed a great bodily injury enhancement for aggravated mayhem.  We strike the great bodily injury enhancement for aggravated mayhem.  In all other respects, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Nardini is D.L.'s father.  They rarely spoke to each other.  But their relationship was improving.

In March 2023, Nardini and D.L. went together to the memorial for Nardini's grandfather.  That afternoon they got a "little flask-sized bottle" of vodka and took a few sips while driving.  Around dusk, they went to the home of Nardini's sister, J.N.  While they waited for her to come home, they almost finished the bottle.

About 7:00 p.m., J.N. arrived home with her partner, S.D.  J.N. helped Nardini and D.L. finish drinking the bottle.  Nardini and J.N. then bought a fifth of vodka, and the three of them drank a little more than half of it in the backyard patio.

D.L. was "pretty drunk."  Nardini was drinking as much as D.L., but J.N. did not know if Nardini was more or less intoxicated than D.L.  The three also smoked marijuana.  There was conflicting testimony whether they ingested cocaine.

As they socialized on the patio, D.L. became emotional and agitated.  Around midnight he yelled at Nardini "really bad

2

things about what kind of father he [was]." As Nardini sat in a chair, D.L. hit him with his fist three or four times in the face and head. Nardini did not fight back and "just sat there." J.N. tried to separate them but D.L. "brushed [her] off," throwing her onto a rock and bruising and scraping her hip.

Nardini got up and walked away. J.N. thought he went to "cool off."

D.L. was intoxicated, upset, crying, and walking back and forth. S.D. talked to him for about 20 minutes and calmed him down.

At around 1:00 a.m., Nardini's truck got stuck in the mud. When S.D. arrived to assist, he found Nardini's speech coherent, understandable, and not slurred. He attached a towing chain and instructed Nardini to "give it just a touch bit of gas" when he felt tension in the chain. Nardini did it "perfect" and S.D. pulled the truck back onto the pavement. Nardini drove on the winding road back to the house. S.D. drove behind him and believed Nardini drove safely.

While S.D. and Nardini were gone, D.L. fell asleep on a U-shaped couch in the living room. J.N. always slept on her "spot" on another part of the couch because S.D. snored.

S.D. arrived back at the house and went to sleep in the bedroom. Nardini stayed outside for a smoke.

When Nardini came into the house, J.N. showed him an improvised bed she made for him on the floor next to the couch. She told him D.L. was asleep.

J.N. was half asleep on the couch when Nardini shook her shoulder. He asked her to give him her spot on the couch and sleep with S.D., saying the foam mattress on the floor hurt his back. Nardini was aggravated and "under the influence." They

3

argued about him taking her spot. About 10 to 20 minutes after S.D. got in bed, J.N. went into the bedroom.

If there had been a conversation in the living room, it would have been audible in the bedroom. But neither J.N. nor S.D. heard any talking. About 10 minutes after J.N. entered the bedroom, S.D. heard five to six muffled thuds. J.N. heard three to five thumping sounds, then heard the back door open and shut.

J.N. and S.D. found D.L. lying on the couch twitching, gurgling, and coughing with blood all over the pillow and couch. Nardini was gone.

Sheriff's deputies found a sledgehammer in the dirt in the backyard with D.L.'s blood on it. The sledgehammer was not where S.D. kept it, which was by the garage door, next to a smaller four-pound sledgehammer. S.D. kept the larger sledgehammer to break solid concrete.

D.L. blacked out before he hit Nardini while on the patio and did not remember anything until he woke up in the hospital ten days later. His blood alcohol level in the hospital was .297. His jaw was fractured and wired shut. His cheekbone and other bones in his face had multiple fractures. Permanent titanium plates were put in his chin and cheek, and a gash in the back of his head was stapled shut. His ear was split in multiple areas and his inner ear was injured. At time of the trial, he had lost almost all hearing in his right ear.

*Pretext call*

Later that morning, J.N. made a pretext call to Nardini that was recorded by detectives. Nardini said D.L. "got what was comin' to him." Nardini described how D.L. hit him in the head on the patio and hurt J.N. and said, "So, yeah, I beat the fuck out of him, dude. What else was I supposed to do?" "And this is what

4

he fuckin' does to me, and then he hurts you.  And yeah, motherfucker needed an ass-whoopin' is what the fuck he needed."  He asked, "so he gets to beat up on me and then just go to sleep like a baby, like everything's cool?"

Nardini admitted he sent J.N. to the bedroom because he knew what he was going to do and "didn't want [her] to see that shit."  He said he hit D.L. with a lock hidden in his hand and "probably" with the hammer.  He denied trying to kill D.L. but was trying to "teach his ass a lesson."  During the call, Nardini did not mention being intoxicated.

Miranda <em>interview</em>

Nardini was advised of his *Miranda*[2] rights and was interviewed by detectives.  He said he, D.L., and J.N. shared "a little half pint" of vodka, two or three shots each.  At trial, Nardini said it was a pint of vodka.  Later they got a "big bottle" of vodka and "everything got blurry."  They were drinking "a little" when D.L. hit him in the head.  Nardini then went outside to "cool off" and "calm down" for 20 to 30 minutes.  He sat in his truck and thought about driving home but "thought about it for a minute" and decided to "just go back and try to squash it."

When Nardini was getting ready for bed, D.L. sat up and "puffed up his little chest."  Nardini said, "Then when he shot me that little look and I thought maybe he was gonna jump up again."  Nardini said he then got what he thought was "an old wooden stick" to protect himself.  He "got to [D.L.] before he could get me first."

Nardini said J.N. and D.L. were "shit-faced" but Nardini was "pretty good."  He said he had "a decent amount to drink" so

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

it was "a little blurry but . . . the gist of the situation is completely clear."  He later said they were all drunk.

*Appellant's testimony*

Nardini testified that he and D.L. arrived at the memorial in the morning and each had a beer there.  At J.N.'s house, the three of them drank a pint of vodka and then part of a fifth of vodka.  They were "all drinking a lot" and were intoxicated.

After D.L. struck him, Nardini left to "cool down."  He took the fifth of vodka with him, which was about a third full.  His truck got stuck and S.D. pulled him out.  From the time Nardini left the house until he returned was 20 to 30 minutes.  Ten to 15 minutes later he asked J.N. if he could sleep in her spot because he was "nervous laying down right next to [D.L.]."

After J.N. left the room, D.L. sat up.  Nardini got nervous, went outside, and grabbed what he thought was a stick from the dirt right outside the door.  He got the stick in case D.L. charged at him.  Nardini was "extremely drunk" and did not know the stick was a sledgehammer.

D.L. attempted to stand up and Nardini pushed him down.  Nardini hit D.L. with the stick because he thought D.L. was going to attack him.  From the time Nardini was punched until he hit D.L. was at most 40 minutes.  Nardini said he kept a lock in his truck for "emergencies," but was confused when he said he hit D.L. with it.  Nardini said he never intended to kill D.L.  Nardini then drove from Simi Valley to Littlerock, California.  He woke up drunk, then finished the bottle from the night before.

DISCUSSION

*Voluntary intoxication instruction*

Nardini contends the jury was incorrectly instructed it could not consider voluntary intoxication to determine whether

6

the alleged attempted murder was deliberate and premeditated. We agree the instruction was erroneous but conclude the error was harmless.

Attempted murder is punishable by five, seven, or nine years in state prison.  But if the trier of fact finds the attempted murder was "willful, deliberate, and premeditated," the punishment is "imprisonment in the state prison for life with the possibility of parole."  (§ 664, subd. (a); *People v. Gonzalez* (2012) 54 Cal.4th 643, 654.)

"A trial court must instruct the jury, even without a request, on all general principles of law that are " ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case." ' "  (*People v. Burney* (2009) 47 Cal.4th 203, 246.)  "Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly."  (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)

Here, the jury was instructed: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill or to permanently disable or disfigure someone."  The instruction concluded: "You may not consider evidence of the defendant's voluntary intoxication for any other purpose."  (CALCRIM No. 625, modified, incorporating language from CALCRIM No. 3426.)  The court erroneously deleted the bracketed language in CALCRIM No. 625 that voluntary intoxication may be considered regarding whether "the defendant acted with deliberation and premeditation."

The Attorney General concedes the instruction was

erroneous because voluntary intoxication can be considered to determine if attempted murder is deliberate and premeditated. (§ 29.4, subd. (b); *People v. Castillo*, *supra*, 16 Cal.4th at p. 1016.) We accept the concession.  But we also agree with the Attorney General that the error is harmless.

Erroneous jury instructions are subject to harmless error analysis.  (*People v. Hendrix* (2022) 13 Cal.5th 933, 941 (*Hendrix*).)  Errors of state law are harmless unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  " ' " '[A] "probability" in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " ' "  (*Hendrix*, at p. 944.)  "[T]he question is . . . whether the nature of the evidence leaves us ' "in serious doubt as to whether the error affected the result." ' "  (*Id*. at p. 946.)  In evaluating whether an error is harmless or prejudicial, we may "consider the strength of the evidence."  (*Id*. at p. 948.)  A more favorable result includes a reasonable probability that at least one juror would have voted to find the premeditation allegation not true, resulting in a hung jury.  (*Id*. at p. 947 & fn. 6.)

However, errors under the federal Constitution are harmless only if the prosecution can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  (*Chapman v. California* (1967) 386 U.S. 18, 24.)  Under *Chapman*, "instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence,' " but not where " 'the record contains evidence that could rationally lead to a contrary finding with

8

respect to the omitted element.' " (*People v. Mil* (2012) 53 Cal.4th 400, 417.)

In *Hendrix*, the jury instruction erroneously stated that a defendant's mistake of fact could negate the specific intent required for burglary only if the mistake was reasonable. (*Hendrix, supra*, 13 Cal.5th at pp. 940-941.) Our Supreme Court concluded it was unnecessary to decide whether to apply *Watson* or *Chapman*. (*Hendrix*, at p. 944.) Similarly here, we need not determine which test applies because we conclude the error was harmless under either standard for the following reasons.

First, the elements and burden of proof for deliberation and premeditation were explained to the jury:

"The defendant *deliberated* if he carefully weighed the consideration for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act of attempted murder.

". . . A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved." (CALCRIM No. 601, modified; see *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Based on these instructions, we conclude the jury was required to consider whether attempted murder was impulsive or

the result of careful reflection.

Second, neither the record before us nor counsel's argument suggested that Nardini's purported intoxication affected his deliberation or premeditation.  (See *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661 [voluntary intoxication instruction not required where evidence showed defendant was drinking but did not "*also* show[] he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state"]; *People v. Roldan* (2005) 35 Cal.4th 646, 715-716.)  The defense argued the facts were "clouded by alcohol" and challenged the idea that Nardini "was so sober that he didn't have blackouts, that he didn't get confused, that his judgment wasn't clouded."  But the defense did not argue that the attempted murder was impulsive and did not mention deliberation or premeditation.  Counsel argued instead that Nardini struck D.L. in self-defense without intent to kill.  The jury rejected that theory.

Third, the evidence of deliberation and premeditation was overwhelming.  Nardini attacked D.L. after a cooling off period of some 40 minutes.  Nardini considered driving home but "thought about it for a minute" and decided to "go back and try to squash it."  When S.D. pulled out Nardini's truck, he was coherent and drove safely back to the house.  He had additional time to deliberate as he stayed outside for a cigarette.  He went into the room where D.L. was sleeping and insisted J.N. leave the room because he knew what he was about to do and did not want her to see it.  He then went outside and armed himself with the large sledgehammer.  He repeatedly hit the sleeping D.L. in the face with the sledgehammer.

Based on the totality of the instructions, the theory of the defense, and the overwhelming evidence of deliberation and

10

premeditation, we conclude it is not reasonably probable that the correct voluntary intoxication instruction would have resulted in a different outcome.  For the same reasons, we also conclude the evidence establishes beyond a reasonable doubt that the erroneous instruction did not contribute to the verdict.

*Section 654 discretion*

Nardini contends the trial court failed to exercise its discretion to select the count on which to impose sentence.  We disagree.

At sentencing, the prosecution correctly noted the three counts stemmed from the same facts and were subject to section 654.  The prosecution asked the court to "determin[e] that attempted premeditated murder is the primary charge."  The court stated, 'The law . . . puts some constraints on me from a sentencing standpoint."  It then stated that in light of Nardini's prior record, the aggravating factors, and the brutality of the crime, it could not find it in the interest of justice to grant probation.  (§ 1203, subd. (e)(6).)

The court then stated, "So that takes me to what the law requires, and there's not a lot of discretion that I've got in this area.  On Count 1, that is the controlling count, the 664/187(a), attempted murder, the Court is going to sentence the defendant to life with the possibility of parole."  The court declined to strike the one-year enhancement for use of a deadly weapon (§ 12022, subd. (b)(1)) or the three-year enhancement for inflicting great bodily injury (§ 12022.7, subd. (a)).  For count 2, aggravated mayhem, the court imposed life with parole, plus one year for use of a deadly weapon and three years for inflicting great bodily injury, all stayed pursuant to section 654.  For count 3, assault with a deadly weapon, the court imposed the midterm of three

11

years and three years for great bodily injury, all stayed pursuant to section 654.

Section 654 previously provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment." (§ 654, subd. (a), as amended by Stats. 1997, ch. 410, § 1, p. 2753.) It was amended effective January 1, 2022, to provide that a criminal act punishable by different provisions "may be punished under either of such provisions." (§ 654, subd. (a), as amended by Stats. 2021, ch. 441, § 1.) The amendment provides the trial court with discretion to select the count on which to execute sentence. (*People v. Jones* (2022) 79 Cal.App.5th 37, 45.)

In our view, the trial court's statements do not show that it misunderstood its discretion. The sentencing occurred almost two years after the amendment's effective date. We presume the trial court knew the law and properly exercised its discretion. (*People v. Weddington* (2016) 246 Cal.App.4th 468, 492). "Thus, we may not assume the court was unaware of its discretion simply because it failed to explicitly refer to its alternative sentencing choices." (*Ibid.*) The trial court correctly observed that its discretion was limited; attempted murder with deliberation and premeditation (§§ 664, subd. (a), 187, subd. (a)) and aggravated mayhem (§ 205) each have only a single sentencing option of life with parole. The only discretion for those counts would be granting probation (§ 1203, subd. (e)(6)) or striking the deadly weapon or great bodily injury enhancements (§§ 12022, subd. (b)(1), 12022.7, subd. (a)), which the court explicitly declined to do. We also conclude the court's comments about the "absolute brutality" of Nardini's conduct clearly

12

indicate it would not impose a determinate sentence.

We also reject Nardini's claim that he received ineffective assistance because his counsel did not ask the court to impose sentence on another count. Such a request would have been futile. (*People v. Baker* (2018) 20 Cal.App.5th 711, 720.) Based on what the trial court described as a "gruesome and horrific" crime leaving the victim with "life changing" injuries, the aggravating factors, and the court's exercise of discretion to impose the enhancements, we conclude the court would not have imposed a determinate sentence if requested to do so.

Counsel advocated for his client by asking the court to not impose the enhancements. Nardini and his wife both wrote letters to the court asking for a sentence other than life in prison. Nardini has not shown a reasonable probability of a different outcome if counsel had repeated their request. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

*Great bodily injury enhancement*

The jury found true the allegation that Nardini personally inflicted great bodily injury in the commission of count 2, aggravated mayhem. (§ 12022.7, subd. (a).) The court stayed the enhancement pursuant to section 654.

We agree the great bodily injury enhancement for count 2 must be stricken because great bodily injury is an element of mayhem. (*People v. Pitts* (1990) 223 Cal.App.3d 1547, 1558-1560; see *People v. Santana* (2013) 56 Cal.4th 999, 1008.) Because the trial court imposed the maximum sentence for count 1 and stayed count 2 and its enhancements, we do not remand for resentencing on other components of the sentence. (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 773 [no resentencing where maximum

sentence imposed].)

## DISPOSITION

The great bodily injury enhancement (§ 12022.7, subd. (a)) for count 2 is stricken.  The clerk shall prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:


GILBERT, P. J.


CODY, J.


14

Anthony J. Sabo, Judge

Superior Court County of Ventura

_____

Olivia Meme, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.